## KELLOGG vs. WOOD.

To enable a party to read documentary evidence at the hearing, under the provisions of the 75th rule, it is not necessary that notice of his intention to do so should have been given, to the adverse party, ten days before the time limited in the order to produce proofs expired ; but it is sufficient if the notice is given ten days previous to the actual entry of the order to close the proofs.

Where a mortgagee has received an equitable satisfaction of his mortgage, if he afterwards attempts to set it up as a subsisting lien upon the mortgaged premises, satisfaction of the mortgage may be decreed, so that it may be cancelled on the record of mortgages.

Where the owner of land, which is subject to a mortgage, conveys the same with warranty, the covenant of warranty runs with the land, and is bound by the lien of a judgment against the grantee of the land, or his assigns ; and if the grantor subsequently acquires title to the land, under a foreclosure of the mortgage, such title enures to the benefit of a purchaser at the sheriff's sale under the judgment, and such grantor is estopped from questioning the title of such purchaser.

The original grantor is also bound to indemnify the purchaser at the sheriff's sale against the mortgage, if it remains unpaid, or where the lien thereof is continued by the substitution of a new mortgage for the purchase money a foreclosure.

Where A., who is the owner of land subject to a mortgage, conveys the same to B. with covenants of warranty, who afterwards conveys to C. with similar covenants, both covenants run with the land ; and if C. afterwards conveys the land to A., the original owner, the covenants in the deed from B. are merged, at law, so far as respects the lien or encumbrance of the mortgage. But if, in the intermediate time, B. has made a valid agreement with A. that he will pay off and discharge the mortgage, the covenants in the deed from B. are not merged in equity, but they will pass to a subsequent grantee of A., so as to give such grantee an equitable claim against B. upon those covenants, for an indemnity against the mortgage.

When an equitable claim, to be relieved from an encumbrance on land, attaches itself to the legal estate of the owner of the land, such equity will be bound by the lien of a judgment against such owner, and will pass to the purchaser of the legal estate at a sheriff's sale under such judgment, so as to entitle him, in equity, to relief against the encumbrance.

In the case of a mere equitable interest of a judgment debtor, in lands held for him in trust, and which are liable to be sold on execution under the provisions of the fourth section of the statute of uses, the judgment is only a lien upon the estate of which the trustee was seised to the use of the judgment debtor at the time of the issuing of the execution ; and not upon that of which he was so seised at the time of docketing of the judg-

ment, as in the case of lands of which the debtor is seised as of a legal estate.

A trustee who holds the legal estate for the use of another person, and who refuses to convey to him, will not be allowed to purchase in an outstanding title, for his own benefit.

1834.

Kellogg
v.
Wood.

THIS case came before the chancellor upon an appeal from a decision of the vice chancellor of the 7th circuit. The bill was filed before the chancellor in July, 1828 ; and being ready for hearing upon the pleadings and proofs, it was referred to the vice chancellor of the 7th circuit for his decision. The facts in the case, most of which depended upon documentary evidence, are stated at length in the opinion of the chancellor. A preliminary objection was raised before the vice chancellor, as to the right of the complainant to read on the hearing certain pieces of documentary evidence, not referred to in the pleadings or made exhibits before the examiner, on the ground that notice of the complainant's intention to use such evidence, at the hearing, was not given within ten days before the time limited in the order to produce proofs had expired. The objection was overruled by the vice chancellor, but was again renewed by the appellant upon the hearing of the appeal.

October 21.

The following is the opinion of the vice chancellor, upon which the decree appealed from was founded :

D. MOSELY, V. C.  As preparatory to the main question, whether the complainant can enforce the obligation devolving upon the defendant by virtue of the bond given by him and Hall to William Lard on the 16th of September, 1799, he undertakes to derive a title to the 38 $\frac{21}{100}$ acres and village lot No. 9, of which William Lard died seised, and to village lots Nos. 6, 7 and 8, conveyed by the defendant and Hall to Lewis and Ellis, and to which parcels of the 99 $\frac{3}{4}$ acres only he claims title. To the 38 $\frac{21}{100}$ acres in the north-east corner of the lot, it is apparent that William Lard continued to hold the title, by his deed from Conyne for the whole, till his death ; and also that he was reinvested with the title to village lot No. 9, through the deeds from the defendant and George Hall, dated 13th November, 1799, to Ephraim Webster, and from Webster to

1834.

Kellogg
v.
Wood.

Lard on the 4th June, 1800 ; and as to these portions, the ti-
tle passed under a decree of the surrogate, by the deed from
James Lard and Peter Young, his administrators, dated the
26th September, 1803, to Joshua Forman and William H. Sa-
bin.   Next in the order of time, village lot No. 9 was convey-
ed by Forman and Sabin, by deed dated 29th November,
1805, to Artemas Underhill, though intended to be to a man
by the name of Underwood, as appears from Sabin and Thay-
er's testimony.   The consideration, $500, for this lot was paid
by Thayer, and the deed taken in the name of Artemas Un-
derhill, for the benefit and by the direction of Thayer.   The
evidence of Sabin and Thayer abundantly establish this fact.
Underhill was then a mere trustee for Thayer ; and as this
was a resulting trust in favor of Thayer, capable of proof by
parol, the land was his, and was liable to be sold under judg-
ments against him.   (*Foote* v. *Colvin*, 3 *John. Rep.* 216.   *Boyd*
v. *M'Lean*, 1 *John. Ch. R.* 582.)   Thayer's title to the 38 $\frac{21}{100}$
acres rested in a contract made with William H. Sabin for
himself and as the attorney of Joshua Forman.   The evidence
arising from this contract is objected to for want of competent
authority shown in Sabin to contract for Forman.   This ob-
jection seems to be well taken, for it cannot be maintained
that Sabin could execute a valid contract under seal, bind-
ing Forman to convey his interest in the premises without
a competent authority.   But the case does not rest the point
there.   That contract, valid as against Sabin, was dated
on the 5th May, 1806.   Thayer went into immediate pos-
session of the premises under it, and paid in full for the
land, as appears by Sabin's testimony.   He having remain-
ed in possession from that time to 1819, and having paid
in full, would be entitled to a specific performance of the con-
tract, at least for the conveyance of one half of the premises ;
and it would not, I think, be presuming too much, from the
length of time, to say that Forman's assent was given to the
contract.   But this point is supported still further.   The bill
charges that Thayer made a contract with Joshua Forman
and William H. Sabin for the purchase of their portion of the
lot, describing it, paid for it and took and continued the pos-
session of it ; and the answer admits that he, Thayer, did

purchase and pay for it, and take and continue the possession ; denying, however, knowledge of the precise nature or terms of the contract of purchase. I have no doubt that the answer means to admit that purchase. It does not appear that Thayer received his deed for this parcel from Forman and Sabin, but the payment of the whole consideration and a possession of thirteen years vested a title in him which might be sold on execution ; and Forman and Sabin became trustees for him. In equity, Thayer became seised, to all purposes, by the payment of the whole consideration, *though at law* he would not have a legal seisin ; (*Purdy* v. *Doyle*, 1 *Paige's R.* 558 ;) and for authority to sell such an interest on execution, I cite *Bogert* v. *Perry*, (1 *John. Ch. Rep.* 52,) confirmed in error, (17 *John. Rep.* 351 ;) and that the same may be sold, whether the whole or a part of the consideration is paid, is declared in *Jackson* v. *Parker*, (9 *Cowen*, 73.) As to village lots Nos. 6, 7 and 8, the answer admits, in accordance with the charge in the bill, that on or about the month of January, 1812, Thayer was seised in fee of those lots, and was in possession of the same by title derived through sundry mesne conveyances from John Ellis of No. 7, and from Elihu Lewis of Nos. 6 and 8, but in respect of the two last lots, subject to the two mortgages of Elihu Lewis ; and not admitting a knowledge of the particular chain of title. Believing that the remark relative to No. 9 is applicable to these three lots, and that the answer means to admit Thayer's title to them, I have not thought it necessary to encumber the case with a detail of the documentary evidence tending to show a transmission of the title at law, from the defendant and Hall, down to Thayer, the person in possession in 1819. At this period, then, I deem it satisfactorily established that the title to these lots, Nos. 6, 7 and 8, rested in Salmon Thayer, united with the equitable seisin of village lot No. 9 and the 38 $\frac{21}{100}$ acres. The judgment of Forman and Sabin, of the 25th June, 1811, against Thayer, attached and became a lien upon these parcels of lot No. 104. The subsequent sale by the sheriff on the execution issued upon this judgment, in March, 1819, transferred the same title which Thayer had, to Simeon West, who took and continued the possession. The judgments of the

complainant against West in 1814, attached in like manner, and became a lien upon these lands from the moment the title to them vested in West, by the sheriff's deed to him in March, 1819. And the sale by the sheriff, by execution upon the last mentioned judgment, and his deed to the complainant in April, 1825, transmitted the title to the latter, who took the possession, and now holds it. The complainant having thus acquired the title at law to the premises, and the defendant having brought a suit in ejectment to assert the title which he claims to have acquired, under the attorney general's sale to him in 1817, calls upon the latter, through the aid of this court, to fulfil the condition of his bond to William Lard, to disencumber the property from the mortgages given by himself to the state, and from Elihu Lewis to himself, and to quiet him in his title. Can this claim be sustained, and to what extent ? When William Lard, who had purchased of Conyne the whole lot No. 104, sold to the defendant George Hall the 160 acres on the south side of the lot, and took their bond as part of the consideration, in the penalty of $2000, to pay off the whole of Conyne's mortgage to the state, he had a right to consider this bond as a fund appropriated to the discharge of the encumbrance on the remainder of the lot, the entire interest in which he then owned. The position to be maintained is, that this bond enured to the benefit of all persons deriving title to any portion of the lot under William Lard ; and the complainant urges the analogy between this and a covenant running with the land, which is available to a grantee holding the title. To that end he cites many authorities, among which and the principal ones are the following, which have been looked into : *Withy* v. *Mumford*, (5 *Cowen*, 137 ;) *Matter of Howe*, (1 *Paige*, 125 ;) *Jackson* v. *Matsdorf*, (11 *John. Rep.* 91 ;) *Cheesebro* v. *Willard*, (1 *John. Ch. R.* 409 ;) *Astor* v. *Miller*, (2 *Paige*, 78.) The defendant insists that it was a bond with a penalty, unlike in all respects a covenant running with the land, and that having a condition to pay a sum certain, covenant would not lie upon it—citing *Cro. Eliz.* 494, 187, 608 ; *Bacon's Abr. title Debt, A.* ; and that as covenant will not lie upon the condition of a mortgage, neither will it upon the condition of a

bond. (*Powell on Mortgages*, 16, 61, 119, 132. *Cro. Jac.* 281.
1 *Modern R.* 36, 7.) And moreover, that if it was a covenant,
it was a personal contract only, and not a covenant running
with the land, because there was no privity of estate. (*Webb*
v. *Russell*, 3 *T. R.* 393. *Sugden's L. of V.* 367, 368, 372. 1
*H. Black.* 562. 5 *Co.* 16. 10 *East*, 130.) And further, to
show that if the bond be a covenant running with the land, it
became broken when the obligors failed to pay the state mort-
gage, given by Conyne, according to its condition, in 1806, and
therefore was not assignable, he cites 1 *Salkeld*, 109, 199 ; 2
*Mass. Rep.* 455 ; *Bickford* v. *Page*, (1 *Mod. R.* 45 ;) 1 *Espi-
nasse*, 347 ; *Hamilton* v. *Wilson*, (4 *John. Rep.* 72 ;) *Kellogg's
Administrators* v. *Wilcox*, (2 *Id.* 1.) These authorities, cited
on the part of the defendant, do indeed show that the case is
not parallel with a covenant contained in a deed running
with the land, upon which any subsequent grantee may main-
tain an action for its breach against the original grantor. Nor
have I been able to discover, among the authorities cited by
the complainant, a principle by which he could maintain an
action at law of covenant or debt upon this bond. Neither
do I believe that the complainant will be remediless, unless
such a principle be established. The analogy may be discov-
ered at some distance, in the case of a covenant on the part of
a lessee relative to the manner of occupying the demised prem-
ises, or other covenant relating to the thing demised, which
runs with the term ; which covenants are binding upon the as-
signee of the lessee and are available to the assignee of the les-
sor, as illustrated in the case cited by the defendant's counsel
from 10 *East*, 130. Let the question be presented at but one re-
move from the original parties to the bond. Suppose William
Lard, holding that bond, conditioned to pay off and discharge
the whole of the Conyne mortgage, died leaving his heirs
in possession ; and instead of paying up the mortgage giv-
en by Conyne, the defendant had suffered the lot to be ad-
vertised and sold under it, bid it in himself, and brought an
action of ejectment to recover the possession. If this is a nat-
ural statement of the case, no sensible man can doubt that
those in possession would have been enabled to defend them-
selves in equity against so unjust a claim, instead of being

1834.

Kellogg
v.
Wood.

forced to surrender the possession, and to trust to the precarious remedy on the bond. This would be taking advantage of the defendant's own wrong in a palpable neglect of duty, to work most manifest injustice. But after Lard's death, his title passed from his heirs, by virtue of a sale under the surrogate's order. They had therefore no interest in the bond; and if the administrators had brought their suit for a breach of the bond, a court of equity would have relieved; or if suffered to proceed, the proceeds of the suit would have been a fund in court for the benefit of Lard's grantees, if the land had been sold by him, or for his creditors having liens, or bona fide purchasers, under the surrogate's order; and not assets. A fund having been provided by William Lard for the discharge of the encumbrance upon his farm in the defendant's hands, the trustee ought not to alter the destination of it, and especially without the assent of the cestui que trust, given before his power to assent is parted with. (*Presbyterian Church of Bethel* v. *Docenam's Executors*, 1 *Dessau.*) It would have been manifestly unjust for Lard's personal representatives to have put the contents of that bond into their pocket, to the injury of a grantee of Lard, if one existed, or of a bona fide purchaser under a judicial sale, and to have left them to the contingent remedy of an action over against the heirs, subject to a plea of riens per descent. The defendant therefore is to reap the benefit of Lard's death, discharged of a direct liability on his bond, or the bond is to enure to the benefit of those who have acquired title to the estate. Salmon Thayer succeeded to that title as a bona fide purchaser, and was entitled to enjoy it in like manner. The defendant now claims that Thayer had a right to treat with him relative to the discharge of that bond, and that he did so. The arrangement made in 1816 between Thayer and the defendant and George Hall relative to opening an account with the comptroller for the whole he owned in lot No. 104, charging the greater part of the money due on Conyne's mortgage upon that part of the lot, is relied upon to sustain this position. The act of April 2d, 1813, (1 *R. L.* 476, § 4, 5, 1 *R. S.* 175, § 33, 34,) was passed for the ease and convenience of those who owned subdivisions of lots mortgaged to the state; authorizing the comptroller to open an ac-

count with any one who wished it, for a subdivision of a lot, on his complying with the provisions of the act. As this act could not, by its operation, confer any new title, neither did it contemplate changing the relative rights of the owners of the subdivisions of a lot among themselves, nor ought any proceedings under it to affect the rights of encumbrancers. According to the averment in the answer, and as appears in the statement of the case, the defendant and Hall had previously sold to Thayer two several parcels of the lot lying on their 160 acres, and received bonds and mortgages to the amount of near $1000 ; also one parcel to one John Lard, and took his bond and mortgage for $505, which Thayer had assumed to pay, making a debt of $1477, but a small part of which had then been paid, though they had then obtained a judgment on one of Thayer's bonds. Towards the payment of this debt, as the defendant avers and as Thayer testifies, the latter, in 1816, agreed to open an account in the comptroller's books, and charge upon the 99 $\frac{3}{4}$ acres then owned by him its original proportion of principal due on the Conyne mortgage, with all its interest, and discrediting this part of the lot with any previous payments, and to procure the rest of the lot to be discharged of so much as he should thus assume ; and for the amount which Thayer should procure to be charged in his account, he was to be credited upon the three bonds given by himself and John Lard. The bond of the defendant and Hall, given to William Lard, was then spoken of as being lodged in the hands of William H. Sabin for Thayer's benefit ; and the defendant avers that Thayer agreed to procure it and have it cancelled. Sabin testifies that he held it for the benefit of the owners of the lot. The object seemed to be, to increase the charge on this part of the lot, at least to the sum due from Thayer as before stated. It may be remarked here, that at this time the defendant recognized the existence of his bond to William Lard, its validity, his subsisting liability upon it, and, as he avers in his answer, " assented to the above arrangement for the purpose so far to discharge said bond given by him and Hall to William Lard." The acts of the defendant, at this period, furnish a striking illustration of his own

Vol. IV. 74

sense of the obligation resting upon him by virtue of that bond. By the comptroller's certificate, dated 15th March, 1817, and made an exhibit in the cause by the defendant, it appears that Thayer, on the 25th of January, 1817, procured such account to be opened, and that the sum of $669,66 of principal and $612,47 of interest, equal to $1282,13 in amount, was charged upon his 99 ¾ acres, including the premises in question. It should also be observed here, that by a subsequent arrangement between the defendant, Hall and John Lard, the latter also opened an account with the comptroller for what was termed a remainder, owned by him on the lot No. 104, in the north-west corner ; that he took upon himself the balance of the sum due the state in Conyne's mortgage, and, as appears by the certificate of the comptroller before cited, the residue of the lot, except these two accounts, was released and discharged from the Conyne mortgage. There then remained no one having any interest in the defendant's bond but Thayer and his encumbrancers. The validity of the above agreement. made with Thayer, so far as it affected the rights of his pre-existing judgment creditors or mortgagees, if he had any, it is believed, cannot bear the weight of an examination in a court of equity. It was indeed a skilful arrangement between the immediate parties to it, to enable Thayer on the one hand to use the credit which the state was expected to give to its debtors, to pay off the debt then immediately pressing upon him from the defendant for the purchase of the two parcels of 22 and 11 acres, and the debt he had agreed to pay for John Lard, at least to the amount of $1282,13 in the whole ; and to enable the defendant, on the other hand, to pay an amount of $1282,13 on his bond to William Lard, then and long before due, and thus be the means of procuring this bond to be cancelled.

As between the subsequent grantees of William Lard, each part or subdivision of the lot ought to have borne its relative proportion of the original debt due to the state, according to the rule of contribution. But if that arrangement is finally to succeed, injustice would evidently be the result. True it is that the Conyne mortgage was a charge upon the whole lot and upon every part of it ; but Thayer, by pro-

ducing prima facie evidence of ownership to the ninety-nine and three quarter acres, and by ex parte proof furnishing evidence to the comptroller, that the residue was ample security for the amount to be charged upon it exclusive of improvements, clothed him with the requisite authority to open the account and to charge upon this portion any amount of the original debt which Thayer saw fit to assume, not exceeding of principal its original proportion ; and which operation, together with a similar one of John Lard for another portion, worked a discharge of the residue of the lot, and which residue turned out to be the remainder of the 160 acres sold by William Lard to the defendant and Hall, subject to the state's mortgage.

Although persons who had superior claims on this section of the lot, thus indirectly burthened, would be without a remedy for relief as against the state, its officers having acted within the letter of the statute, they would also be without any claim as against the other parts of the lot, for contributions ; having been once legally discharged from the original mortgage, they could not be subject again to its operation. As between the immediate parties to this arrangement, there is nothing in it exceptionable ; nor is it necessary to impute to either any design intentionally to commit a fraud upon others ; but if the direct practical effect of it is such, that the liens of previous encumbrancers are to be utterly subverted, and that the defendant had notice of them or was bound to take notice, it is the duty of this court to protect those liens by setting aside the intermediate acts, if yet within its reach, or to call upon the defendant to restore them by disencumbering the land of his mortgage to the state. What might have been the precise state of things, and to which the complainant's rights would have been subject, had no act of the defendant, in combination with Thayer taken place, it is not necessary to consider. The defendant has substituted his own mortgage upon the premises in lieu of Conyne's, and it is now out of his power to restore the lot to the original condition in which it was in 1816 before the account was opened. The consummation of that agreement, then, between Thayer and the defendant, did in its operation impair,

if not effectually destroy the lien of Forman and Sabin's judg-
ment, docketed in 1811. The docketing of this judgment
was notice to the defendant of the creditor's rights. In *Bo-
gert* v. *Perry*, (1 *John. Ch. Rep.* 55,) Chancellor Kent asserts
the principle that the docketing of a judgment is constructive
notice to others of the creditor's rights; and in *Johnson* v.
*Parker*, (9 *Cowen*, 73,) above cited, the same position is main-
tained by Chief Justice Savage. It was equally out of the
power of Thayer, the judgment debtor, to make any arrange-
ment impairing the lien of that judgment. A purchaser of
lands at a sheriff's sale, on execution, acquires all the rights
which the creditor had, for he stands in the creditor's place,
"and is armed with his rights." (*Hildreth* v. *Sands*, 2 *John.
Ch. Rep.* 50.) The creditor, by virtue of his judgment, ac-
quired a lien upon Thayer's lands, tenements and chattels
real, which he had at the time the judgment against him was
docketed in 1811, or at any time thereafter within 10 years.
(1 *R. L.* 500, § 1. 2 *Id.* 359, § 3, 4.) The title and interest
of Thayer, therefore, in these lands, which he had in 1811 or
at any time afterwards, became transferred to and vested in
the complainant by virtue of these respective judgments
against Thayer and West, and the sales under them, and
unaffected by any act of Thayer or of the defendant. In
1816, Thayer owned these lands, with a right to have them
redeemed from Conyne's mortgage in discharge of the duty,
devolving upon the defendant by his bond, then acknowledg-
ed by him. The arrangement between Thayer and the de-
fendant, therefore, was a fraud upon the judgment creditors of
the former. It was virtually engrafting upon Conyne's mort-
gage of 1796 the two mortgages of Thayer to the defendant
and Hall, and of John Lard's also, to the amount of $1282,13,
thus in effect tacking the junior mortgages to the senior, and
thereby loading the estate so as to sink it from the interme-
diate judgments, to the overthrow of all fair dealing. Thay-
er entirely neglected to pay the sum due on his account, or
any part of it; and in 1817, that part of the lot, for which he
had opened an account, being 99¾ acres, and embracing the
$38\frac{21}{100}$ acres, and the four village lots claimed by the complain-

ant, together with the two parcels of 22 and 11 acres, was advertised and sold by the attorney general under the mortgage given by Conyne. The defendant, in pursuance of a parol agreement made with Thayer, bid in the premises for his benefit, and took a deed to himself, as appears from the testimony of G. Hall. The defendant offered afterwards to release to Thayer the premises, excepting the two village lots numbers 6 and 8, on which were the mortgages of Elihu Lewis, upon condition that he would fulfil the condition of the parol agreement, which he refused or neglected to do. It seems also that he offered to Simeon West the same terms : neither having complied therewith, the defendant claims title to the premises under his deed from the attorney general. If the primary proposition be true, that a person purchasing under an encumbrance which he was himself under an obligation to discharge, acquires in equity no title, then the defendant failed to invest himself with a title to these premises through that sale. As neither Thayer nor the defendant paid the state the money required, according to the condition of the bond of the latter given on the sale last mentioned, the attorney general again advertised and sold the premises, under the mortgage given by the defendant, in 1824, and the defendant became the purchaser, and gave his own bond and mortgage anew for one eighth of the purchase money. Under the deed received from the attorney general on this sale, the defendant claims the title discharged of any trust arising between him and Thayer, and he relies upon the statute of frauds as well in the first sale as the second in regard to the purchase. However clearly the authorities quoted by the defendant may sustain the position as between himself and Thayer, we have seen that the question is presented between the defendant and the encumbrancers of Thayer ; and I cannot discover that a sale, ever so often repeated, would give vitality to a title through it to the premises in question, at least until a bona fide purchaser is introduced. It was objected on the argument that the sale under Forman and Sabin's judgment by the sheriff to West for the sum of twenty dollars only, was fraudulent, and that he could derive no title under it. The single fact of the smallness of the sum

1834.

Kellogg
v.
Wood.

bid, on a sale at auction, by the sheriff, unaccompanied by any collateral circumstances casting suspicion upon the transaction, is insufficient to impeach the validity of the sale ; (*Hildreth* v. *Sands*, 2 *John. C. R.* 55, 50 ;) nor does it become the defendant to complain of the smallness of the sum bid, where he had by the sale, to which he was a party in 1817, done so much to throw a cloud upon the title which might be derived under the sale to West in 1819. Thayer, the defendant in the execution, is the more proper person to subject this question to the strength of the law. It was also insisted that West, while in possession, recognized the arrangement made relative to the opening the account, and admitted his obligation to discharge the encumbrance, by offers made to the defendant to pay him a certain quantity of salt, and to take a release of the whole premises from him subject to his mortgage. This testimony was objected to at the time of taking it before the examiner, and such an offer or declaration, or any admission made by a person in possession claiming title, after he has encumbered the premises, cannot be received to impeach his title so as to impair his encumbrance, though such admissions may be available if made prior to the time when the lien attached. (*Park* v. *Peek*, 1 *Paige's Rep.* 477.) I come to the conclusion, then, that the bond given to William Lard in 1799, conditioned to pay off and discharge the mortgage executed upon lot No. 104 to the state, was a subsisting obligation binding upon the defendant in 1816 and available to Thayer, who had succeeded to the title of William Lard in the $38\frac{21}{100}$ acres in the northeast corner of the lot, and to village lots Nos. 6, 7, 8 and 9. That Thayer's title to these portions of the lot was transmitted, in the order and by virtue of the sales already mentioned, to and vested in the complainant, with its equitable claims to protection ; that the agreement to open the account with the comptroller, and charge upon that account $1282,13, was invalid and fraudulent as against the judgment creditors of Thayer ; that the subsequent sale by the attorney general, under Conyne's mortgage, vested no title to these portions of the lot in the defendant, and that the repetition of that sale under the defendant's mortgage gave him nothing more. It was claimed

that G. Hall ought to have been made a party, and that this objection is available on the argument. Without encumbering the case with the settlement of the question whether the objection is raised too late, there does not appear to be any sufficient reason for making him a party. It is evidently too late for the defendant now to ask the aid of this court, at least in this suit, to raise a contribution from Hall towards satisfying his mortgage to the state. The acts of the defendant have worked a discharge of Hall from the bond given by both to William Lard, in the discharge of the Conyne mortgage, by the substitution of the defendant's. Any complaint on this ground, it would seem, would more properly arise from another quarter. Whatever may be the equities between Hall and the defendant, they can better be settled between themselves. The complainant does not appear to be concerned in them. If it be said that Hall had an interest in the two mortgages of Elihu Lewis, to be protected, the history of the whole transaction, a part of which is yet to be detailed, evidently discloses the fact that the defendant appropriated, with the consent of Hall, the avails of these two mortgages to himself. He clearly has now no interest in the event of this cause. A question is yet to be settled, what parcels of the lot No. 104, and to what extent, ought the defendant to disencumber. It is insisted by the defendant that as he took the deed from William Lard for the 160 acres, subject to the mortgage of Conyne to the state, he had a right to suffer that part to be sold if he chose. A critical remark might be made, that the condition of his bond extended to the payment of the whole sum due on Conyne's mortgage ; and hence, whenever the defendant once fully discharged this obligation, every part of the lot would be discharged ; his obligation to pay being co-extensive with the debt due. But, not to rest here, it will be perceived that the defendant was not absolved from an obligation to William Lard to discharge the mortgage on the 160 acres, so far as village lot No. 9 was concerned ; for he afterwards succeeded to the title to this lot, by deed from Webster, derived from the defendant and Hall, and he had a right to enjoy it, discharged of the encumbrance of the old mortgage, in a two-

fold view. First, from a legal claim arising within the condition of his bond against the defendant; and next, as a
grantee of the title in fee derived through Webster; the defendant's deed to him containing a covenant of warranty
which run with the land, and by which the defendant is estopped. (*Jackson* v. *Winslow*, 9 *Cowen's Rep.* 13. *Jackson* v.
*Hubble*, 1 *Id*, 616. *McCraken* v. *Wright*, 14 *John. Rep.* 194.
*Jackson* v. *Matsdorf*, 11 *Id.* 108, *Co. Litt.* § 446.) This
principle applies also with equal force to quiet the title to village lots Nos. 6 and 8, which were conveyed by the defendant
and Hall to Elihu Lewis on the 13th of November, 1799, with
warranty. And lastly, I .think the defendant is equally estopped from asserting a title subsequently acquired to village
lot No. 7, conveyed by him on the same day to John Ellis.
In this conveyance, it is true there is not found any covenant
of warranty. It is in its terms, what perhaps has heretofore
been understood as a quit claim deed, and conveys, for the
consideration of $225, village lot No. 7, and also No. 17 of the
village lots, the latter situated on lot No. 119.

On the examination of the preceding authorities, which in
their direct bearing establish the doctrine of estoppel, wherever a covenant of warranty is contained in a previous deed of a
grantor, subsequently asserting title to the premises, and which
seem to leave us to infer the contrary when no such covenant
is found, I think it will be found, by the facts presented in
the cases and the reasons there assigned, that the rule applies
with equal force to the deed in question. First, in regard to
the facts. In the leading authority which contains the text,
and from which the doctrine of estoppel is derived, Lord Coke
comments upon the case of a father and son: "And the father being disseised, and the son living, the father releaseth
by his deed to the disseisor all the right which he hath or may
have in the same tenements, without claim of warranty—the
father dieth—the son may enter, for that he had no right in
the land, in his father's life, but the right descended to him
after the release made by the death of his father." Now it
is evident that the basis, upon which the principle rests, why
the son should not be estopped is, that as he had no right
in esse at the time of the release executed, he had nothing to

release, and so it was a void act. In each of the subsequent cases the same condition of things is presented. At the time the quit claim deeds were executed, there was no title in the grantors to release. In *McCraken* v. *Wright*, Mr. Justice Spencer says, that "at the time the deed from Boise to Mc-Craken, he (Boise) had no title to convey, and no title not then in esse would pass, unless there was a warranty." In *Jackson* v. *Hubble*, Mr. Justice Woodworth declares the doctrine upon the same footing, for that there was no evidence of title at the time in the person granting. In *Jacksan* v. *Winslow* he reiterates the doctrine, upon the fact in that case in evidence that the person had no title when he conveyed, quoting the text from Coke. Next in regard to the reason which is assigned by Lord Coke, why a deed with warranty works an estoppel for the purpose of avoiding circuity of action. It is true, if it is necessary to find the foundation of an action in a quit claim deed, in case of a defect of title in the grantor, arising against him, so far as this reason is concerned in this form of action, it might fail in the case under consideration, looking into the deed alone. But where one conveys the fee of land to another on full consideration, and the title fails by virtue of a pre-existing encumbrance, natural justice would dictate a restoration of the consideration in some form of action. On the sale of personal property, the vendor impliedly warrants the title; and in case of failure, he is liable in an action to refund the purchase money; and in equity he ought to be equally liable on the sale of real estate. It will be remembered that the fact of the defendant's taking the deed for the one hundred and sixty acres of land, subject to the state mortgage, left the obligation resting upon him to discharge this portion from the state debt, no one standing back of him who was bound to do so. And although, so long as he saw fit to retain possession, there was no one to complain if he suffered the premises to be sold for non-payment to the state, yet, when he sold parcels of this land for full consideration, although by quit claim only, and put the money in his pocket, if he stood by, forebore to pay the state, and saw the portions granted by him sold by the state, and the title thus swept from his

grantees, it was in fact a fraud upon them, aggravated by his becoming a purchaser with a view to acquire a title at law and turn his own grantees out of possession, and such as entitles the party thus exposed to dispossession, to relief. In regard to the deed under consideration from the defendant and Hall for village lot No. 7, the title was in esse at the time, and vested in them, and derived directly from the state through Conyne and William Lard, the defendant being seised as tenant in common of an undivided half of the whole 160 acres on which No. 7 is located. The conveyance of this portion of the premises, then, not being within the disqualification of the rule as applicable to quit claim deeds, and what was uniformly found wanting in the cases cited, to wit, the grantor's title when the release was executed, being found in this, the defendant is justly estopped from setting up title to No. 7. Under this head, I come to the conclusion that the defendant is bound to disencumber, as well village lots No. 6, 7, 8, and 9, as the $38\frac{21}{100}$ acres.

The remaining consideration is, to what extent ought these lands to be discharged from encumbrance by the defendant? If the conclusion to which I have arrived in regard to the title in the several parcels of lot No. 104 be correct, it follows that the defendant should pay up the whole sum secured by his mortgage of the date of August 7th, 1824, and discharge these lands from its operation. But it is insisted by the defendant that the two mortgages given by Elihu Lewis on village lots No. 6 and 8, respectively, are a subsisting lien, and available in his hands, and which the complainant ought to pay off. To this demand, the following facts, and the law arising from them, are claimed to be a satisfactory answer. It is a part of the case, that when the defendant and Hall conveyed to Elihu Lewis village lots No. 6 and 8, parcel of the 160 acres conveyed to them by William Lard in lot No. 104, Lewis gave back mortgages to secure payment of the consideration, being $95 for No. 6 and $80 for No. 8, which were payable in June, 1805.

The testimony satisfactorily establishes these facts: That in November, 1803, Medad Curtis, assuming to be the attorney of Birdseye Norton and Aaron Smith, contracted with

Nehemiah Earll for the sale of the one undivided half of lots No. 77 and 92, with the mills thereon, for the price of $2000, $1200 of which was paid in hand in Bronson's notes, leaving a fund of $800, out of which Earll was to pay the two mortgages of Lewis on village lots No. 6 and 8, amounting to $175; that the defendant, by parol or otherwise, became the assignee of Earll's contract, and assumed its obligations to discharge these two mortgages; that he took possession of the lots No. 77 and 92, with the mills, as early as 1804, and has been in the enjoyment of them to the present time; that on the 27th of January, 1806, a deed in due form was procured by Curtis, the agent, from Smith and Norton for the one half of lots No. 77 and 92, and soon thereafter tendered to the defendant, who was requested to receive it and cancel the mortgages; that he declined a compliance at the time, but promised to do so soon; that the request was renewed from time to time, and by the defendant postponed; that he repeatedly admitted his purchase of Earll's contract, and his obligation to cancel the mortgages; that the lands sold were worth the price agreed to be paid for them; that when cross suits were brought upon Lewis' bond and Earll's contract, they were discontinued at the request of the defendant, and upon his assurance that the matter should be speedily settled. The features of this part of the case are peculiar and significant, and appear to me to need neither authority nor illustration to lead to a right conclusion. The defendant had voluntarily become his own debtor, with a fund in hand of $800, out of which to pay himself as creditor $175. The same hand that was to receive was to pay. The law will make the application; and that, inasmuch as what ought to have been done in 1806, will in 1831 be considered as done. Equity enjoins the satisfaction of these mortgages. The defendant claims that the contract made with Earll was void for want of competent authority in Curtis, and that the contract for the purchase of that contract by himself was only in parol, and therefore void. If it be necessary to perceive that the contract with Earll was obligatory upon Smith and Norton, in order to be of reciprocal validity, the execution of the deed by them is evidence of their assent, and will

warrant the inference of Curtis being clothed with the proper authority. Besides, the deed was a consummation of the contract, and it then became immaterial whether the same was at first good or not. And the taking possession by the defendant, in pursuance of the contract, was so far a part performance of the contract as to prevent him from objecting the statute of frauds. In *Knickerbacker* v. *Harris*, (1 *Paige's Rep.* 210,) a principle is laid down fully sustaining this position. That was a bill filed by a vendor calling upon the defendant to fulfil a parol contract for the purchase of a lot of land. The defendant had entered into possession, and continued it eight or nine years, to the time of filing the bill, and had made various payments; but from a misunderstanding in respect to the details of the contract, refused to fulfil. The chancellor says: "The agreement between the parties, although not in writing, had been so far carried into effect, that neither party was at liberty to raise that objection," and a decree for a specific performance was made. On a review of that opinion in error, (5 *Wendell*, 638,) I consider the rule as laid down by the chancellor most emphatically established. Justice Marcy, in giving the opinion of the court in that case, takes the position that the giving possession under the contract is part performance, and proves and illustrates the doctrine by a critical examination, and a reference to authorities; and in the concluding sentence of his remarks on this point says: "If the purchaser has no other title to the possession of the land, his possession is to be referred to the agreement, that the possession, in that case, was not pretended to be referrible to any other cause than the agreement." It is true that the decree in that case was modified for the reason of a technical variance between the contract set up in the bill and the contract admitted in the answer. The principle upon which the decree was founded was still reiterated. Under the contract of Earll, when the defendant became the assignee of it, $1200 had been paid; he took the possession according to the contract, and continued not for eight or nine years, but for more than 26 years, and has not, on his part, referred that possession to any other cause. So far as it is necessary or proper to trace the history of that transaction to

other parties not now before the court, it is evident that should Smith and Norton call upon the defendant to surrender the possession, after having received $1200 of the $2000, and given possession for this length of time, if no other matter should be disclosed, the defendant could claim a specific performance, the balance being paid. If they should demand the $800, the defendant would say $175 of it was already paid, pursuant to the contract, and I have the evidence in my possession. In addition, the complainant relies upon the length of time, to raise the presumption of payment of the bonds given with the mortgages; no interest or principal having been paid, and no acknowledgment of their being still due, proven. The mortgages were dated in 1799. Lewis, the mortgagor, sold these lands, viz. No. 6 and 8, to Birdseye Norton and Aaron Smith, on the 31st July, 1802. Their successive grantees of the lots have been in possession under that title to the present time, holding adversely to the defendant, he living in the same town, and frequently passing the premises, as appears from the testimony of West. (*Buller's N. P.* 110. 3 *John. Rep.* 386. 7 *Id.* 283. 12 *Id.* 342. 10 *Id.* 381. 5 *John. Ch. Rep.* 545.) I do not find any evidence in the case recognizing the validity of the mortgages, from 1779 till 1816, when the negotiation between Thayer and the defendant commenced; nor was then his attention directly called to these mortgages, as being bound to provide for their payment. And his acts at this time were circumscribed by the judgment of Forman and Sabin, so that he could do nothing to impair it. The ex parte claim by the defendant, in the conversations detailed by the witness, George Hall, that the mortgages were still held as security for a debt due, cannot amount to evidence of their validity, within the spirit of the rule that the whole of a man's declarations made at the same time are to be received in evidence, when that claim was accompanied by no act asserting the right, nor made upon the party supposed to be liable to pay; and especially when the reason assigned why he would not cancel the mortgages, is proven to have been unfounded in truth. Curtis testifies that he repeatedly tendered the deed from Smith and Norton to the defendant, who as often declin-

ed to receive it. A jury might be well warranted in presuming the bonds to have been paid, under these circumstances. Various objections were interposed to the testimony of Medad Curtis and William H. Sabin on their examinations. To Sabin it was objected that, as in his testimony he stated that he held the bond of the defendant and Hall, for the benefit of those interested in lot No. 104, and that he had some interest in another part of it, he was therefore incompetent. It did not appear what that interest was, but situated as the witness was, it would at most only make him interested in the question, and would effect his credibility only; and his testimony, in its material parts, is abundantly supported by other evidence. One objection raised to the competency of Curtis was, that he was one of the executors of Elihu Lewis, whose estate was insolvent, and he liable on the bonds of the testator. It did not appear that Curtis had committed a devastavit. Though a question was put to the witness to that effect, he declined answering it, and there the matter seemed to rest, without calling for a decision, whether he was bound to answer the question. Nor is it believed that the situation in which the witness stood rendered him interested in the event of this suit. Another more imposing objection was raised to the competency of Curtis to testify relative to the execution of the contract on the part of Smith and Norton with Earll, without previously showing a letter of attorney, under seal, from the said Norton and Smith to him, as that contract purported to be under seal. However formidable this objection might have been, if it had arisen in a suit founded on the contract, and previous to 1806, if Smith and Norton saw fit to ratify that contract, as in fact they did, by their deed of 27th January, 1806, and the defendant too, by taking possession under it; the contract became, in effect, executed, and the defendant having enjoyed the property acquired under it, till it has ripened into a title, ought not, and cannot object to its validity. I do not deem it necessary to contemplate the state of things which would result, as between the defendant and Smith and Norton, relative to lots No. 77 and 92, if the view taken in this examination be not correct; an examination of their affairs would probably further show it to be

correct. The defendant, not having shown that he holds those lots by a paramount title, has left the evidence to this point to operate with its full force in the cause. Upon the whole case, I arrive at the conclusion, that the complainant has shown title to the several parcels of lot No. 104, Onondaga, described as $38\frac{21}{100}$ acres in the north-east corner, and village lots No. 6, 7, 8 and 9, as the same are respectively known on the map exhibited ; that the bond of the defendant to William Lard enured to the benefit of the complainant, as owner of these parts of the lot ; that the agreement between Thayer and the defendant relative to opening the account in 1816, was fraudulent, as against the judgment creditors of Thayer ; that the defendant ought to disencumber those portions of the lot from the mortgage given by him to the state ; that the two mortgages of E. Lewis are paid, that the defendant ought to cancel them, and that he ought to release, with proper covenants, to the complainant the premises in question ; that he be permitted to proceed with his ejectment suit against the tenant of the complainant, for other portions of the $99\frac{3}{4}$ acres, and if found in possession, to recover costs in the suit ; and that the complainant recover his costs to be taxed.

*S. Stevens*, for the defendant. The bond from the defendant and Hall to Wm. Lard, conditioned to pay off the Conyne mortgage to the state cannot, in any manner, either at law or in equity, enure to the benefit of the complainant. 1. This bond was with a penalty, conditioned to pay a sum certain, and cannot, therefore, properly be called a covenant. It is an acknowledgment of indebtedness to the amount of the penalty, which may be discharged upon the payment of the sum named in the condition, but there is no covenant to pay that sum. The condition operates as a defeasance, and it is optional with the obligor to perform the condition or not. (*Yelv.* 206.) If he did not perform the condition, he was, at common law, liable for the penalty in an action of debt, but not in covenant. (2 *Bac. Abr.* 279, *tit. Debt*, (*A.*) *ed. of* 1811.) 2. But if the bond be considered as a covenant, it was a mere personal contract, and not a covenant running with the land. There must be privity of estate, otherwise covenants do not run with

the land.   It is not sufficient that a covenant concerns the land; there must be a privity of estate between the covenanting parties.   (*Webb* v. *Russell*, 3 *T. R.* 403, *per Lord Kenyon. Idem*, 678.   *Stokes* v. *Russell*, *S. C. in Excheq. Cham.*, 1 *H. Black.* 562, 5, 6.   *Sugden's Law of Vend.* 368.   *Spencer's Case*, 5 *Co.* 17.)   The covenant must be to do or omit to do something which is parcel of, or appurtenant to the demised premises; otherwise it is merely collateral, or in gross as it is sometimes called.   (*Mayor of Congleton* v. *Pattison*, 10 *East*, 129.)   What privity of estate was there between the defendant and Lard?   The defendant conveyed no estate to Lard, but merely gave this bond as a part of the consideration for land which had been formerly conveyed to him.   Any bond given to secure the purchase money for land might be called a covenant running with the land, as well as this.   3.   But even if it should be considered that this bond was a covenant running with the land, that covenant was broken at the time the mortgage to the state became forfeited, which was before Simeon West acquired any title to the premises.   The covenant broken became a mere chose in action, which could not be assigned, and could not run with the land after the breach.   Neither West, nor the complainant who claims under West can therefore claim a right to relief under the bond.   (*Griscott* v. *Green*, 1 *Salk.* 199.   *Bull. N. P.* 158, 159.   *Bekford* v. *Page*, 2 *Mass. Rep.* 455.   *Kellogg* v. *Wilcox*, 2 *John. Rep.* 1.   *Hamilton* v. *Wilson*, 4 *Id.* 72.   *Lewis* v. *Ridge*, *Cro. Eliz.* 863.)   4. Whether, therefore, this bond be considered as a mere personal contract, or a covenant running with the land, Thayer had a right to discharge it, so far as the land in controversy (the 99¾ acres) is concerned, at the time he did discharge it in 1816.   If it be a mere personal contract, it was assigned to him by Sabin, or held for his benefit, so far as his interest was concerned, and therefore he could discharge it, so far as his interest was concerned.   He had a right to receive the amount in money which would be necessary to extinguish so much of the mortgage to the state as was justly chargeable upon such part of lot No. 104 as was owned by him, and to discharge the defendant and Hall from so much of said bond; and he did receive that amount, by that sum being applied on

mortgages which he was bound to pay. If the bond be considered a covenant running with the land, he had a right to discharge it in the same manner, while he was owner of the land, whether the covenant was broken or not. A vendee, while he owns the land, can discharge the vendor from any of the covenants in the deed. If the covenant be broken, he can sue for the breach, and a recovery of the vendor puts an end to his liability. Surely it will not be contended that the vendor may not settle with the vendee before suit; and that too without the concurrence of the judgment creditors of the vendee, if it be fairly and honestly done. A parol accord and satisfaction after a breach is a good defence to a covenant. (2 *Bac. Abr.* 93, *tit. Covenant,* (*L,*) ed. *of* 1811.) A judgment is a lien, not a title; and it is only a lien upon the legal interest or title of the judgment debtor. It is in no manner a lien upon the covenants in his deed; because, if those covenants are broken before a sale under the judgment, the purchaser acquires no title to the damages for the breach of such covenants. Nor is there any way he can reach them, except by a creditor's bill, as he would any other chose in action due to his debtor. Independent of the bond from the defendant and Hall, to Lard, there is nothing in the case which entitles the complainant to any relief, in law or equity. The defendant acquired a valid title to the premises, both in law and equity, under the attorney general's sale. After the arrangement between Thayer and the defendant and Hall, in 1816, they stood precisely in the situation as if the defendant and Hall had conveyed to Thayer subject to the mortgage to the state. The defendant had the same right that any other individual had to become a purchaser under that mortgage. But whatever may have been the title acquired under the first sale, under the second the defendant acquired an absolute title, discharged from all trusts; and which title he was compelled to acquire, in consequence of Thayer's not performing the agreement under which the defendant had purchased at the first sale. The complainant, under any view which can be taken of the case, has no superior or prior equity to the defendant; this court will not, therefore, restrain the defendant

from pursuing his legal rights. (*Fonb. Equ. Book* 1, *ch.* 4, § 25, *p.* 321.) In the whole transaction, no principle of law or equity has been violated by the defendant. He has intended no fraud, and has committed none. The judgment of Forman and Sabin was not a lien upon the agreement or covenant of the defendants to discharge the Conyne mort- gage. That was a personalty. The judgment was only a lien upon such title as Thayer had to the land. That was a title subject to the Conyne mortgage. Forman and Sabin, the judgment creditors, could not enforce that covenant, even if it run with the land, before they had acquired title by a sale un- der their judgment. As judgment creditors merely of Thayer, they had no legal or equitable right to interfere with any cov- enant between Thayer and his grantors, even if such covenant was in the deed, and run with the land. But the defend- ants' equity in this case is superior to the complainant's. All the complainant acquired by his purchase under Forman and Sabin's judgment was the legal estate upon which the judgment was a lien at the time of the sale. No other es- tate is transferred by a sheriff's sale. (*Livingston* v. *Hubbs*, 2 *John. Ch. Rep.* 512.) The purchaser knows that no equita- ble rights are acquired under such sale. No consideration is paid for such rights.

The documentary evidence of the complainant was improp- erly received on the hearing before the vice chancellor. This objection, if well taken, must exclude all the documentary evidence not made exhibits before the master, or distinctly referred to in the pleadings ; and the complainant must fail, for the want of evidence of title. The rule requires that such notice should be given at least 10 days before the expiration of the time to produce proofs. (*See* 75*th Rule.*)

*L. H. Sanford*, for the complainant. The notice of the in- tention to use the documentary evidence on the hearing was given in season, it having been given ten days before the entry of the order closing the proofs.

The bond executed by the defendant and George Hall to William Lard, conditioned to pay off the mortgage executed by Conyne to the state, was in equity a fund in the hands of

1834.

Kellogg
v.
Wood.

the defendant to pay off the mortgage. It enured to the benefit of all persons deriving title to lot No. 104, under William Lard. The subsequent arrangement with Thayer did not alter this liability of the defendant, or his rights ; and if it had altered the latter, the case of the *Presbyterian Church of Bethel* v. *Docenam's Executors,* (1 *Dessaus. Ch. R.* 154,) shows that the defendant could not, by his act, alter the destination of the fund. It was an interest transmissible in equity by assignment, and was divisible, like the easement in the case of *Hills* v. *Miller,* (3 *Paige's R.* 254,) and is analogous in principle to covenants running with the land at common law. It was in the nature of a warranty against the Conyne mortgage. (*See Astor* v. *Miller,* 2 *Paige's Ch. Rep.* 78—*S. C. in error,* 5 *Wendell,* 603, 618, *by name of Astor* v. *Hoyt ; Withey* v. *Mumford,* 5 *Cowen's Rep.* 137.) And as analogous in principle, we refer to *In re Howe et ux.,* (1 *Paige's R.* 125 ;) *James* v. *Hubbard et al.,* (*Id.* 228 ;) and *Cheesebro et al.* v. *Willard,* (1 *John. Ch. Rep.* 409.) If merely a bond, the breach was continuous, like the cases of covenants to pay encumbrances, assessments, &c. mentioned by the chief justice in *Astor* v. *Hoyt,* (5 *Wendell's Rep.* 618.) In the cases of leases, in which it was held that the covenants were not assignable and did not run with the land, the reason assigned was, that the covenants in question were respecting something collateral, or not in esse when made ; which reason does not exist in the case of the bond here, as the Conyne mortgage was in esse when the bond was given. Besides, the whole English doctrine, which commenced with the case in 5 *Coke's R.* 16, appears to be exploded by the decision of our supreme court in *Lametti* v. *Anderson,* reported in 6 *Cowen's Rep.* and affirmed in error in 6 *Wendell.*

The deeds of the four village lots, given by the defendant and Hall, estop the defendant from setting up any title derived from any encumbrance created prior to those deeds. They conveyed lots No. 6 and 8 to Elihu Lewis, and lot No. 9 to E. Webster, with warranty. As to these three, therefore, the point stated is incontrovertible. (*Co. Litt.* 265, *a. Jackson* v. *Matsdorf,* 11 *John. R.* 91. *Jackson* v. *Winslow,* 9 *Cowen,* 13, *S. P.*) Lot No. 7 was conveyed to John Ellis, for a full con-

sideration, by a quit claim deed. The defendant is also estopped by this deed. In all cases of fraud or concealment, equity relieves without covenants. (3 *Cruise's Dig.* 87, 88, *tit. Deed.*)

Salmon Thayer, by the deed to Artemas Underwood, became seised in fee of village lot No. 9. Thayer purchased the lot and paid for it—was in possession when it was conveyed, and continued in possession ; but, by his direction, the lot was conveyed to Underwood. This was a resulting trust in favor of Thayer, who thereby became sole owner of the lot ; and it was subject to execution against him. (*Foote* v. *Colvin,* 3 *John. Rep.* 216.) If A. buys land with the money of B. and takes a conveyance to himself, he is a trustee for B. (*Boyd* v. *M'Lean,* 1 *John. Ch. R.* 582. *Botsford* v. *Burr,* 2 *Id.* 405.)

Thayer, by his contract of purchase for the 50 acres in the north-east corner of lot No. 104, taking possession and paying for it, became seised absolutely of that parcel, although he received no deed. By the contract of purchase and possession under it, even if not paid for, Thayer acquired an interest which was subject to the lien of the judgment, and to a sale on execution. (*Jackson* v. *Scott,* 18 *John. R.* 94. *Jackson* v. *Parker,* 9 *Cowen,* 73. 3 *Paige,* 219.) By the full payment of the purchase money, Forman and Sabin became trustees for Thayer, and he thereby acquired a complete equitable title to the premises. (*Purdy* v. *Doyle,* 1 *Paige,* 558. *Bogert* v. *Perry et al.,* 17 *John. R.* 351. 1 *John. Ch. R.* 52, *S. C.*)

Thayer derived title to village lots No. 6, 7 and 8, from the respective owners thereof ; and at the docketing of Forman and Sabin's judgment, was in possession, as absolute owner, of the 38 $\frac{21}{100}$ acres and the four village lots.

It is objected that the proof of the assignment by Earll to the defendant was insufficient, being by parol. We answer that a parol assignment, or a delivery of a chose in action, is sufficient—as of a judgment in the case of *Ford* v. *Stuart,* (19 *John. R.* 342,) and so in the cases of *Briggs* v. *Dow,* (*Id.* 95,) and *Prescott* v. *Hull,* 17 *John. R.* 284.) The mortgages of E. Lewis were in fact paid in 1804, at least, from the lapse of time, they will be presumed paid. The law is well settled. Where, under a mortgage, no possession had been taken, nor interest paid, nor steps taken to enforce it, for nineteen years, it was

held not to be a subsisting outstanding title, and that a jury might presume it satisfied. (*Jackson* v. *Pratt*, 10 *John. R.* 381. *Jackson* v. *Wood*, 12 *Id.* 242. *S. P. after* 20 *years*.) In *Giles* v. *Baremore*, (5 *John. Ch. Rep.* 545,) this court held it to be a well settled rule, both at law and in equity, that a mortgage is not evidence of a subsisting title, if the mortgagee never entered and there has been no interest paid for twenty years.

Forman and Sabin's judgment was a lien on the whole of the W. Lard 38 $\frac{21}{100}$ acres and the four village lots, which could not be impaired by any subsequent agreement of Thayer; and at that time the defendant and Hall were bound to Forman and Sabin, as well as to Thayer, to discharge the Conyne mortgage. Thayer had the legal title to village lots No. 6, 7 and 8, and a complete equitable title accompanied with possession to village lot No. 9, and the 38 $\frac{21}{100}$ acres in the north-east corner. This equitable seisin and actual possession were subject to the lien of the judgment. Thayer was entitled to the benefit of the bond given by the defendant and Hall, as against the Conyne mortgage, for the said four village lots and 38 $\frac{21}{100}$ acres; and West and the complainant, as the purchasers under the judgment of Forman and Sabin, succeeded pro tanto to the benefit of that bond. The judgment was the eldest lien, and no agreement of Thayer could alter, divest or postpone it. That being once a perfect lien, the judgment debtor could not, without the creditor's assent, divest or alter it. (*Rosevelt* v. *Bank of Niagara*, 1 *Hopk. Ch. Rep.* 579. 9 *Cowen's R.* 409, *S. C. in error.* *Sanford* v. *M'Lean*, 3 *Paige*, 117, 123, *S. P.*)

By the sheriff's sale, in March, 1819, on Forman and Sabin's judgment, Simeon West acquired all the right and title which Thayer had on the 25th June, 1811, to the 38 $\frac{21}{100}$ acres and the 4 village lots. At the time of the sale, West was the owner and assignee of the judgment, the whole of which, viz. $213,50, with interest from the 22d August, 1812, was then due. West purchased Thayer's right for twenty dollars. He owned the judgment, and Thayer was insolvent. The defendant objects that this bid was evidence of fraud. A sufficient answer to this objection is the fact that the defendant did not set up or insist upon this defence in his answer. He is too

late with it at the hearing. (*Mohawk Bank* v. *Atwater*, 2 *Paige*, 54.) But the objection, if properly presented, is untenable. In *Hildreth* v. *Sands*, (2 *John. Ch. R.* 35, 50,) where the complainant purchased for $215 property worth soon after $6000 or $7000, Chancellor Kent says, " Though the complainant be a purchaser at a very low price, yet it was a fair purchase in the regular course of law ; it does not become the parties to the fraudulent deed to complain of the plaintiff's cheap purchase ; it cannot interfere with the question of right."

Immediately upon West's purchase, the complainant's judgment of 1814 became a lien on the premises. His judgment in 1821 became a lien when it was entered ; and by the sheriff's sale to the complainant in 1824, and the deed in 1825, he became seised of all the title Thayer had on the 25th June, 1811. As purchaser under his judgment against West, and by virtue of West's purchase under Forman and Sabin's judgment, the complainant is entitled to all the rights which Forman and Sabin had or could have. (*White* v. *Williams*, 1 *Paige*, 502, 8. *Hildreth* v. *Sands*, 2 *John. Ch. R.* 50, *S. P.*)

Thayer's agreement with the defendant and Hall to open a new account with the comptroller, and to charge his $99\frac{3}{4}$ acres with the Conyne mortgage, was a fraud on his judgment creditors, and void as to the $38\frac{21}{100}$ acres and the 4 village lots. Thayer's declarations, after 1811, and West's also, were and still are objected to. They were clearly inadmissible to impair either Forman and Sabin's or the complainant's judgment, under the authorities cited on the preceding page, as well as by the case of *Park* v. *Peck*, (1 *Paige*, 477,) where admissions were admitted on the ground that they were made long prior to the encumbrances set up.

The defendant's purchase of the $99\frac{3}{4}$ acres, at the attorney general's sale in 1817, was a fraud on the then owner of Forman and Sabin's judgment, and upon those claiming under it. The defendant's purchase in 1824 was a repetition of the fraud against the complainant. Both purchases were void as to the $38\frac{21}{100}$ acres and the 4 village lots. The defendant's mortgages to the state are merely a continuation of the Conyne mortgage, and the latter, which the defendant was by his

bond bound to pay, is in substance and effect still outstanding. To confirm and quiet the complainant's title, and to prevent circuity of action, the defendant should be decreed to convey to the complainant the 38 $\frac{21}{100}$ acres and the four village lots, as described on the map, with covenants against his and the Conyne mortgages to the state, and to indemnify the complainant. The deed should contain a consideration large enough to cover fully the defendant's last mortgage to the state and costs, &c. because, in an action at law on the covenants in the deed, the recovery would probably be limited to the amount of the consideration expressed. (*See Pitcher* v. *Livingston*, 4 *John. R.* 1. *Bennet* v. *Jackson*, 13 *Id.* 50.) The defendant should be perpetually enjoined from proceeding in his ejectment against the complainant for the premises in question. This was so decreed by the vice chancellor. The case of *Thompson* v. *Graham*, (1 *Paige*, 384,) is in point as to setting aside the defendant's deeds from the attorney general.

We are entitled to costs, as we were compelled to come into this court by the defendant's ejectment against our tenant, in which our equitable rights could not avail us against his regular legal title. If necessary, we refer to *Hunn* v. *Norton*, (1 *Hopk. R.* 344,) and *Vancomer* v. *Bliss*, (11 *Ves. jun.* 458,) as to the general rule ; to *Webster* v. *Wise*, (1 *Paige*, 319,) for an analogous case ; and also to *White* v. *Williams*, (1 *Paige*, 502 ;) and *Hildreth* v. *Sands*, (2 *John. Ch. R.* 35,) which are similar to this case.

THE CHANCELLOR. To understand and properly dispose of the great variety of legal questions and tangled equities which are presented in this case, it will be necessary that I should examine the facts somewhat in detail. But before I proceed to that examination, it is proper that I should dispose of the question as to the admissibility of certain documentary evidence which was read upon the hearing. It is supposed by the appellant's counsel that the 75th rule of this court makes it necessary that the notice of the intention to produce a document at the hearing, which by law is entitled to be read without proof, such as exemplifications and deeds which are proved or acknowledged under the statute, must be given at

1834.

Kellogg
v.
Wood.

least ten days before the order to produce witnesses expires, and that it is not sufficient to give such notice more than ten days previous to the entry of the order to close the proofs. The language of the rule, " ten days before the expiration of the time allowed to produce proofs," is perhaps ambiguous. But it certainly will admit of the construction contended for by the counsel for the respondent ; as the parties are allowed to produce and examine witnesses, after the expiration of the time limited in the order, at any time previous to the actual entry of an order to close the proofs.    It frequently happens that the whole of the testimony in a cause is taken after the expiration of the time limited in the order to produce witnesses, without any written stipulation between the parties or their solicitors or counsel.    And a construction of this rule should not be given which would prevent a party from giving notice of his intention to use documentary evidence on the hearing, in such a case, provided there were ten days between the giving of such notice and the closing of the proofs.    No inconvenience whatever can arise from the construction I am disposed to put upon the rule ; as the party who receives such notice, if he is not disposed to examine witnesses in relation to the documentary evidence, or is unwilling that such evidence should be used on the hearing, may himself enter the order to close the proofs, and thus prevent its being thus used.    And the party giving the notice cannot prevent the examination of witnesses, or the production of countervailing proofs before the examiner, within the 10 days, without precluding himself from the benefit of the documentary evidence of which he has given notice.    Another conclusive answer to this objection is, that the 75th rule does not apply to the present case.    By a reference to dates, it will be found that the time limited by the order to produce witnesses, expired on the first of January, 1830, the very day on which that rule was adopted ; so that a compliance with its provisions was impossible, if the construction contended for by the appellant's counsel is correct.    And as the former practice allowed documentary evidence to be used on the hearing without such previous notice, the 75th rule could not be permitted to operate retrospectively, so as to deprive the complainant of his rights.

1834.

Kellogg
v.
Wood.

The controversy in this cause relates to certain portions of lot No. 104, in the Onondaga reservation. This lot is supposed to contain 250 acres of land; and was conveyed to A. Conyne in 1796, by the surveyor general, under the act of April, 1795, for the better support of the Oneida, Onondaga and Cayuga Indians. (3 *Laws of N. Y. by C. R. & G. Webster*, 115.) Conyne gave back a mortgage to the state for the purchase money, $1535, as directed by the statute; which mortgage was duly registered. In 1797 Conyne conveyed the whole lot to W. Lard. In April, 1799, Lard conveyed 160 acres on the south side of the lot to the defendant T. M. Wood and to George Hall, with warranty. And in part payment of the purchase money, in September, 1799, Wood and Hall gave to Lard a bond, in the penal sum of $2000, conditioned to pay and discharge the state mortgage. A part of the 160 acres sold to Wood and Hall was then laid out by them into village lots, containing six acres each. On the 13th of November, 1799, they conveyed lot No. 7, of the village lots, to John Ellis, without warranty; and on the same day they conveyed lot No. 9 to E. Webster and lots No. 6 and 8 to E. Lewis, with warranty. Upon lot No. 6, Lewis gave back a mortgage of $95, for the purchase money, and a mortgage on lot No. 8 for $80. Previous to 1816, S. Thayer derived title to lots No. 6, 7 and 8, through divers mesne conveyances, from Ellis and Lewis; and he also obtained the title to lot No. 9 by the operation of a resulting trust. In May, 1806, J. Forman and W. H. Sabin, who had obtained the legal title to 38 $\frac{21}{100}$ acres of the original lot No. 104, lying in the north-east corner thereof, and not included in the 160 acres conveyed to Wood and Hall, contracted to sell the same to S. Thayer for $400, payable one half in three and the residue in four years, with interest annually. It appears that the whole of the purchase money of this piece of land has been paid to Forman and Sabin; but that no conveyance of the land was ever given by them to Thayer. Possession was taken by Thayer, under this contract to purchase, and he continued in possession until 1819. In January, 1811, Wood and Hall conveyed to Thayer 22 acres of their 160

acres, north of the village lots, and took back a bond and mortgage for $477,36 of the purchase money; and on the 29th of April, 1814, they also conveyed to him another small piece, containing 11 acres and 19 rods, lying west of the village lots, and took back a bond and mortgage for $500. On the same day they conveyed to J. Lard another piece of land in their 160 acres, containing 11 acres and 36 rods, and took back a bond and mortgage of $505 for the purchase money; of which Lard paid $200 in July, 1815, and January, 1816, and Thayer agreed to pay the residue. But the whole has subsequently been paid or secured to Wood or Hall by Lard himself. In 1816, Thayer, claiming to be the owner of the two pieces of land conveyed to him, by Wood and Hall, in 1811 and 1814, the piece he had contracted to purchase of Forman and Sabin, and the four village lots above mentioned, and of part of lot No. 10 of the village lots, and wishing to pay Wood and Hall the balance due on his two bonds and mortgages, and the balance of J. Lard's mortgage, of which he had assumed the payment, agreed with Wood and Hall to apply to the comptroller, under the act of April, 1813, relative to the office and duties of the comptroller, (1 *R. L.* 476, § 4, 5,) to have a new account opened for these several lots and pieces of land, amounting to 99 ¾ acres in the whole, and to have the same charged with a share of the whole principal and interest of the mortgage to the state, so as to relieve the rest of the lot for that amount; and that the amount thus charged on the 99 ¾ acres should be allowed to him upon his two bonds and mortgages, and upon the J. Lard mortgage, which was to be assigned to him. An account was accordingly opened on the books of the comptroller, at the request of Thayer, by which $1282,13 of the principal and interest of the state's mortgage was charged upon the 99 ¾ acres, and the residue of lot No. 104 was discharged therefrom. Thayer having neglected to pay the interest due on this portion of the mortgage to the state, the lands embraced in this new account were advertised for sale, in the fall of 1817, by the attorney general. An agreement was thereupon entered into between Wood and Thayer, by which the former was to go to Albany and attend the sale and bid in the land, pay what was re-

quired to be paid down, including the costs, take a deed in his own name and give a mortgage back to the state for the surplus, and was to hold the same for the benefit of Thayer, or to convey the same to him subject to the payment of the mortgage to be given by Wood to the state. Under this agreement, the defendant purchased in the premises, on the 17th of November, 1817. He paid down for the costs and one eighth of the purchase money, $191,41, and gave a new bond and mortgage on the same 99 ¾ acres, for the residue, $1148. At this time there was due to Thayer from Wood and Hall about $425, over and above the balance due to them upon the two mortgages given by Thayer; allowing him for the $1282,13 assumed in the new account opened with the 99 ¾ acres. Thayer, who was examined as a witness for the defendant, swears to this fact. And West, who was also examined as a witness for the defendant, was present when Thayer and Hall and Wood looked over their accounts, in 1819, swears it was found that Wood and Hall would owe Thayer about that sum, after allowing them the amount due on his bonds and mortgages, provided he paid the state the amount of the new account. This did not include the balance due on the J. Lard bond and mortgage, which had not been assigned to Thayer agreeably to the original understanding between the parties. But both these witnesses swear that the amount paid by Wood on the attorney general's sale, and the amount which was to be allowed to him for his services were to be deducted from this balance of $425. This also corresponds with the statement made out by Hall, in 1818, and marked as defendant's exhibit No. 2. It will be seen by that statement that the amount due on those two mortgages, including the costs of the judgment and compound interest up to the 3d of December, 1818, was $977,79. But if the compound interest on the two bonds and mortgages is only cast up to the 25th of January, 1817, when the new account was opened, and the costs of the judgment as stated in the answer of the defendant are added thereto, it will amount to a little short of $860 ; which sum, deducted from the amount assumed by Thayer in the new account, will leave about the sum of $425, as testified to by these witnesses ;

1834.

Kellogg
v.
Wood.

without making any allowance for the interest on this balance from January, 1817, to the time of the attorney general's sale.

In 1811 Forman and Sabin recovered a judgment against Thayer, in the Onondaga common pleas, for a debt of about $200, which was subsequently assigned to S. West. Under an execution issued on this judgment, all the right and title of Thayer to the original lot No. 104, which includes the 99¾ acres, was sold by the sheriff, in March, 1819, and the same was bid in by West for the sum of $20. Under the conveyance from the sheriff, West went into possession of the 99¾ acres, and continued in possession until 1825, when the same were conveyed by the sheriff to the complainant, upon a sale under two judgments and executions against West. On the 7th of June, 1824, after the sale by the sheriff to the complainant but within the time allowed for redemption, the attorney general again sold the premises under the state mortgage, and Wood again bid them in, for $1608,85, of which sum he paid down $231,11, and gave back a new mortgage to the state for the residue, which mortgage is still due. The defendant having brought an action of ejectment against a tenant of the complainant, this bill was filed to restrain him from proceeding in that suit, and to compel him to convey the premises to the complainant, and to pay off or indemnify him against the mortgage given by the defendant to the state. The vice chancellor decided that the complainant was entitled to the four village lots, and to the 38 $\frac{21}{100}$ acres contracted to be sold by Forman and Sabin to Thayer, discharged of the mortgage to the state and of the mortgages given by Elihu Lewis for the purchase money of lots No. 6 and 8 of the village lots; and he decreed accordingly. The appellant has furnished me no copy of his appeal, but, from the arguments of the counsel on both sides, I presume he has appealed from the whole decree. I shall therefore proceed to examine and decide the case upon that supposition.

There can be no doubt of the correctness of the conclusion at which the vice chancellor arrived, as to the payment of the two mortgages given by Elihu Lewis to secure the payment of the purchase money on lots No. 6 and 8 of the village lots.

These two mortgages, amounting to $175, were given in 1799, and were payable on or before the first of July, 1805, with interest, at the rate of six per cent., payable annually. And in July, 1802, Lewis, the mortgagor, conveyed No. 6 and one half of No. 8 to Smith and Norton, together with several large lots, mills, &c. and died soon after. In November, 1803, Medad Curtis, professing to act as the agent of Smith and Norton, contracted in their names to sell to N. Earll lands in the Onondaga reservation, valued in the contract at $2000; and as a part of the consideration of the purchase, Earll was to pay the amount due on these two bonds and mortgages to Wood and Hall, so as to save the estate of Lewis harmless; Smith and Curtis being two of the executors of the estate. In the spring of 1804, by agreement between Wood and Earll, the former agreed to take this contract, and Curtis was requested to have the deed made to him, which was made accordingly by Smith and Norton, in January, 1806, and the same was offered to Wood, who was then in possession under the contract. And he was requested to cancel the mortgages, which he neglected to do, although he has continued ever since in the possession of the lands mentioned in the contract and deed. Nothing appears to have been paid, either for principal or interest, and no person having an interest in the land has ever recognized them as subsisting liens thereon, since Wood took this contract from Earll and agreed to perform the same. And the last payment on each mortgage became due more than twenty-three years before the filing of this bill. As the defendant still insists upon these mortgages as subsisting liens upon the mortgaged premises, notwithstanding they were paid, in equity, and the legal presumption, after such a lapse of time, being that they are in fact paid, they ought not to be permitted longer to remain as a cloud upon the title. The vice chancellor has therefore very properly directed that the defendant should acknowledge satisfaction, that they may be cancelled on the record.

The rights of the parties as to the lands in controversy in this cause depend upon different principles as regards the different parcels. There can be no possible doubt that the legal title to lots No. 6 and 8 of the village lots is now in the

complainant; and that he is entitled to be protected against the encumbrance of the present mortgage to the state, executed by the defendant. The covenants of warranty contained in the two deeds to Lewis were covenants running with the land; and when Thayer afterwards became the owner of the legal estate, by a title derived under and through those deeds, he became entitled to the benefit of those covenants, which were not then broken, as a part of his title to the lands. The lien of the Forman and Sabin judgment, therefore, attached upon his interest in the covenants of warranty as well as in the land itself; and those covenants passed with the land to the purchaser, under the judgment, as his title relates back to the time when the lien commenced. And Kellogg, under his subsequent purchase, is now entitled to the benefit of Wood and Hall's covenants of warranty as to these two lots. The legal effect of those covenants is, that the title subsequently acquired by Wood, under the attorney general's deeds, enures to the benefit of the complainant; as the defendant is estopped by his covenant from alleging that the whole title was not in himself and Hall at the time they conveyed to Lewis. And, under these covenants of warranty, the defendant is also bound to defend the complainant's title against any title or encumbrance which existed at the time the conveyances to Lewis were executed. The present encumbrance to the state is but a continuation of the mortgage lien which before existed; and the defendant, therefore, must relieve the complainant from the lien thereof.

The same principles would be applicable to lot No. 9, which was also conveyed with warranty, had not the covenants of Wood and Hall, contained in their deed to Webster, become merged, at law, by the conveyance from Webster to W. Lard in 1800. By referring to the deed from Lard to Wood and Hall, it will be seen that he covenanted to warrant and defend the title to them. When, therefore, the title revested in him, he could not claim that they should defend him against a claim or lien of the state, which by his own covenants he was bound to defend them against. In other words, if A. conveys to B. with warranty, and B. then reconveys to A. with warranty, the last covenant can only protect A. against

a title or encumbrance, from or under B. subsequent to the original conveyance to him. And if A. is evicted in consequence of an encumbrance or defect in the title prior to that time, he cannot recover against B. on the covenant contained in the last conveyance ; as the covenant in the first would be a complete bar to the suit. But although, at law, the covenant of Wood and Hall was merged, yet in equity it was not, in the present case, in consequence of their bond, by which they had agreed to pay off this mortgage themselves. If Wood and Hall had not conveyed this lot No. 9, but had suffered the land to be sold under the state mortgage, and had then been evicted by the purchaser, a court of equity would not permit them to recover upon their covenants of warranty in the face of their agreement to pay off this bond and mortgage themselves. And it is probable that the agreement would be a valid defence even in a court of law. When the title to lot No. 9 became revested in Lard, he was in equity entitled to the full benefit of Wood and Hall's covenants of warranty, in the same manner as if he had conveyed to them subject to the payment of the state mortgage, and without any warranty whatever. This equity attached itself to the land, and passed to Thayer, by the conveyance of Lard's title, under the surrogate's order, to Forman and Sabin, and which title was conveyed by them to Thayer by the operation of a resulting trust. And the complainant who has acquired Thayer's title, under the judgment against him, has an equal right to protection against the lien of the state mortgage. The covenant of warranty being merged, however, the title subsequently acquired under the attorney general's sale would not probably, at law, enure to the benefit of the complainant, by way of estoppel, so as to enable him to defend himself in the ejectment suit. But this court will afford him the necessary protection by enjoining the proceedings at law ; and by compelling the defendant to convey the legal title, which he has acquired, with covenants of warranty against the mortgage to the state.

The complainant has a similar claim to be protected in his title to lot No. 7 of the village lots, though that was conveyed by Wood and Hall without warranty. The covenants of warranty contained in W. Lard's deed passed by the convey-

ance of this lot to Ellis, and through him to the complainant, who now holds the title which Ellis had under the deed of Wood and Hall. He may, therefore, if he is evicted by Wood, or by a title derived under the original mortgage to the state, recover against the representatives of Lard under that covenant of warranty ; and they would then have the right to turn about and recover the damages recovered against them, in a suit upon the bond. And the bond being joint and several, the suit might be brought against Wood alone. This useless circuity of action a court of equity never resorts to, when the same thing can be effected in another and a more direct proceeding. Besides, the representatives of W. Lard stand merely in the situation of sureties that Wood and Hall will pay off the mortgage, and thus relieve them from the claims of the complainant under W. Lard's covenant. Lard was not personally holden for the payment of the original mortgage to the state. He therefore was not interested in the payment thereof, any farther than was necessary to protect his title to the residue of the land, and to indemnify him against any liability for a breach of his covenants of warranty as to the 160 acres conveyed. And upon the principle of the cases of *The Bank of Auburn* v. *Throop*, (18 *John. R.* 505,) and *Maure* v. *Harrison*, (1 *Eq. Cas. Abr.* 93,) the complainant is entitled to the full benefit of the security thus held for his indemnity ; and which in a court of law could only be sued by the personal representatives of Lard. Wood therefore cannot, in equity, be permitted to proceed in his ejectment suit, to recover possession of the land under the title he has acquired from the state, by the attorney general's sale, and which at law overreaches the complainant's title. It appears, from the dates of the bond and of the conveyance to Ellis, that the bond was given while the title to lot No. 7 was still in Wood and Hall. The bond was therefore, in equity, a release of Lard's covenant of warranty, so far as concerned the mortgage to the state. But as there is nothing in the case to show that Ellis was apprised of that equitable release of the covenants of warranty, he and those claiming under him cannot be deprived of the benefit of those covenants. And the complainant as to this lot is also entitled to a conveyance of the legal estate vested

in Wood, under the deed from the attorney general, and to an indemnity against the encumbrance of the last mortgage.

The same principles would also apply to the 22 and 11 acre pieces, stated in the answer to have been conveyed by Wood and Hall directly to Thayer, if there was any legal evidence of such conveyances; subject, however, to the payment of whatever was equitably due on the mortgage given by Thayer to Wood and Hall upon those two pieces of land. Although there can be very little doubt that such conveyances as are stated in the answer were in fact given, that part of the answer was not responsive to the bill, and was put in issue by the replication. And upon the taking of the testimony, the complainant objected, as he had a right to do, to the introduction of any parol proof that such conveyances had been made. I do not know, therefore, that it would be right or proper for me to give to him the benefit of the illegal testimony, which the defendant actually gave, in favor of the complainant, notwithstanding a valid objection was interposed. I do not see any benefit which the defendant could derive from the proof of such conveyances, as he did not claim title through them. It was only necessary for him to show that he had the bonds and mortgages, as subsisting debts against Thayer at the time of the agreement to open the new account, and that Thayer claimed to be the owner of the land. I must, therefore, for the purposes of this suit, reject the parol evidence which has been given of those conveyances, and act upon the supposition that there was only a parol understanding that the lots were to be conveyed; and that the mortgages were given to Wood and Hall while the legal title still remained in them. The question will then arise, whether the legal lien of a judgment attaches, from the time of the docketing thereof, upon a mere equitable interest, in land, under an agreement to convey. And, in this respect, these two lots will stand upon the same footing with the $38\frac{21}{100}$ acres, held by Thayer under Forman and Sabin's agreement. That question I will now proceed to consider.

I have before said, in reference to lot No. 9, that the equitable right of Lard to protection against the state mortgage, in

consequence of the giving of the bond by Wood and Hall, although not a covenant running with the land, at law, was an equity connected with the land, so that it passed to Forman and Sabin under the sale, by virtue of the surrogate's order. The same principle applies with equal if not greater force, to the 38$\frac{21}{100}$ acre lot, a part of the land not included in the original conveyance of the 160 acres to Wood and Hall. And if the judgment of Forman and Sabin was a lien upon this land, so as to connect itself with this equitable right previous to the agreement of 1816, by which agreement the equities as between Thayer and Wood and Hall were changed, and so as to overreach that agreement as it would have done if the legal estate had been vested in Thayer before that time, the complainant is entitled to the same relief in relation to this lot as he is entitled to in respect to village lot No. 9.

The decree of the vice chancellor pronounces the agreement of 1816 to be fraudulent and void as against the judgment creditors of Thayer. I presume, however, by this, that the vice chancellor only meant that it was equitably void and inoperative as against the purchaser on the execution ; it being overreached by the lien of the judgment. For there is nothing in the evidence in this case even to justify a suspicion that either of the parties to that agreement supposed that any one could be injured or defrauded by the arrangement then made. Although the docketing of a judgment is, by law, a constructive notice to those who afterwards deal with a debtor in reference to lands upon which it is a lien, yet, in point of fact, it is well known to professional men that not one in five, of those who thus deal with judgment debtors, are actually aware of the existence of judgments affecting their interests in the property, or ever think of searching the records of the courts to ascertain whether such a judgment exists. And in this case there was nothing to excite suspicion, or to induce Wood and Hall to suppose Forman and Sabin would be defrauded or injured by the arrangement then made, even if there had been actual notice of this small judgment and that it remained unpaid ; as it is evident, from the testimony, that the real estate of Thayer, on which this judgment was a lien, was of sufficient value to pay several judgments of that

1834.

Kellogg
v.
Wood.

amount, over and above what was charged as a prior lien upon the 99¾ acres by the opening of the new account in the comptroller's office. And, at that time, Thayer was not supposed to be insolvent.

In the case of *Bogert* v. *Perry*, (1 *John. Ch. Cas.* 52,) this court decided that the equitable right of a vendee, under a contract to purchase land, and before the purchase money was fully paid, was not subject to the lien of a judgment against the vendee ; and that such interest could not be sold upon an execution on such judgment, under the provisions of the fourth section of the statute of uses. (1 *R. L. of* 1813, *p.* 74.) And the decree of Chancellor Kent was unanimously affirmed by the court for the correction of errors. The construction which has been given to the provisions of this statute, both here and in England, is, that to authorize a sale of the equitable interest of a judgment debtor on an execution at law, it must be a clear and simple trust for the benefit of the debtor only. The object of the statute, in the language of the late chief justice of England, was merely to remove the technical objection arising from the interest in land being legally vested in another person, where it is so vested for the sole benefit of the debtor. Although the question as to the construction of the statute is thus settled, another question has frequently arisen, whether, in the case of an equitable interest, in land, which is liable to be sold on execution by virtue of this statutory provision, the lien of the judgment attaches upon such equity from the time of docketing of the judgment, or only from the time of the issuing of the execution. In the case of *Hunt* v. *Coles*, (*Comyn's R.* 226,) it was held that the judgment was not a lien upon the legal estate in the hands of the trustee, before execution issued, so as to reach the lands in the hands of a purchaser from the trustee intermediate the judgment and execution. And in the recent case of *Harris* v. *Pugh*, (12 *J. B. Moore's Rep.* 577,) the court of common pleas in England recognized and followed that decision in a case where the judgment debtor had parted with all his equitable interest in the land after the docketing of the judgment, but before the issuing of the execution. These decisions are founded upon the words of the English statute, the same as ours on

this subject, which only authorized the sheriff to take such lands as the trustees were seised of, to the use of the judgment debtor, at the time the execution was sued out ; and not at the time of the docketing of the judgment, as in the case of lands of which the debtor was seised as of a legal estate.   In the case now under consideration, the defendant in the judgment never had the legal title to the $38\frac{21}{100}$ acres; and at the time the execution issued, the legal title to the land was no longer held by Forman and Sabin, in trust for him, under their agreement for sale.   But their legal title, and his equity, had both been displaced, with the concurrence of the judgment debtor, by the attorney general's sale and conveyance, in November, 1817.   A new equity, however, had been created and was then existing in favor of the judgment debtor, under the agreement of November, 1817, which could be reached by the execution, on the Forman and Sabin judgment, which was issued in May, 1818.   That agreement, as testified to by Thayer, the witness of the defendant, was, that the defendant should go to Albany and buy in the $99\frac{3}{4}$ acres for him at the attorney general's sale, and that the amount required to be paid down on the sale, and the $100, which the defendant was to receive for his services, was to be deducted from the $425 which had been overpaid to Wood and Hall in the amount he had assumed and paid for them by the opening of the new account at the comptroller's office.   The understanding between the defendant and Thayer at that time, therefore, must have been, that the balance of the $1282,13, which remained after paying Thayer's two bonds and mortgages, should not be applied by him towards the J. Lard mortgage, as was contemplated at the time the new account was opened; but that Wood and Hall should keep that mortgage, and that the defendant should account with Thayer for the balance.   This it was perfectly competent for them to do, as no person's rights were affected by it.   Thayer was not to pay Lard's mortgage for the benefit of Lard ; but Thayer was to have an assignment of it, if it was paid by him to Wood and Hall.   And as I have before said, Wood and Hall subsequently treated that mortgage as their own, and collected the same.   It is manifest, therefore, that after the attorney general's sale, in

1817, Wood held the legal title to the whole 99¾ acres, as a mere naked trustee for Thayer. And that he owed him, in addition, the difference between $425, the amount overpaid by the opening of the new account, and $291,41, the amount paid at Albany, including the $100 for his services. This equitable interest of Thayer was therefore subject to sale on the execution issued in May, 1818 ; Wood being at that time seised of the land to the use of the judgment debtor, except as to such parts of it as was previously vested in Thayer under the conveyances with warranty, by which the legal title enured to his benefit notwithstanding the purchase by Wood under the older encumbrance. The right which West, therefore, acquired under the sheriff's deed, which covered the whole 99¾ acres, was the legal title to lots No. 6 & 8 of the village lots, with a legal right to insist that Wood & Hall, who had warranted the title originally, should indemnify him against the lien of the state mortgage, so far as those lots were concerned ; and an equitable title to lots No. 7 & 9, with the equitable right to indemnity against the lien of the mortgage as to those lots. And he also acquired the equitable right to a conveyance from Wood of the legal title to all the residue of the 99¾ acres, subject to the payment of the whole amount then due upon Wood's mortgage to the state. The legal and equitable interest thus vested in West continued in him until the issuing of Kellogg's executions, in the fall of 1823, and was subject to be sold thereon. It therefore passed to the complainant, under the sale and conveyance upon those executions, in the same state ; except so far as the rights of the parties were altered by the second purchase by the defendant, under the state mortgage, between the time of the sale by the sheriff and the expiration of the fifteen months allowed to redeem.

As Wood stood in the situation of a trustee, and having refused to convey the legal title to the original cestui que trust, he could not, while standing in that situation, be permitted to make a speculation at the expense of those for whom he held the title. He acquired no new rights, therefore, under the second sale, except the right to be reimbursed the $231,11, which he paid for the interest and costs. It was no part of

the original trust that he should pay the interest or principal on his mortgage to the state. He therefore is not liable for the costs which were made by the neglect of the cestui que trust to pay it up. And the balance of the $425 which remained due to Thayer after the first sale, was a mere personal claim in favor of Thayer, against the defendant, or against Wood and Hall, which did not pass to West by the sheriff's sale. The complainant, therefore, is not entitled to have it offset against the amount paid by Wood on his second purchase. To redeem and obtain a conveyance from Wood, of that part of the 99¾ acres not included in lots No. 6, 7, 8 and 9 of the village lots, the complainant therefore must refund him the amount thus paid, with interest, and must assume the payment of the whole of the mortgage to the state.

The decree of the vice chancellor must be reversed or modified in such a manner as to declare the rights of the parties as thus established. And the complainant is, by the decree, to have sixty days after the same is settled and entered to make his election whether he will redeem, and have a conveyance of the premises not comprised within the four village lots, upon these terms. If he elects to redeem, the defendant is to convey to him the whole 99¾ acres, as described in the attorney general's deed, upon the payment of the sum of $231,11, the amount paid by Wood on the last sale, with interest thereon from the 7th of June, 1824, subject to the payment of the whole of the last mortgage to the state; with covenants against his own acts, or any encumbrances created or suffered by himself, since the purchase under the attorney general's sale, except that mortgage. But if the complainant does not elect to redeem that part of the premises, then the defendant is to be permitted to retain the same free from any claims of the complainant under the sheriff's deed to him. And in that case the defendant is to give a conveyance of the four village lots only, with similar covenants of warranty against his own acts and encumbrances; and he must either clear these lots entirely from the lien of the state mortgage, or give satisfactory security, to be approved by a master, to pay it off within a limited period, and to indemnify the complainant and his heirs and assigns against it. He must also be enjoined

from proceeding farther in the ejectment suit as to the four village lots; and also as to the residue of the premises, if the complainant elects to redeem.

The whole difficulty in this case has probably arisen from the neglect of the defendant to give a conveyance to Thayer, as he should have done, under the agreement made immediately previous to the first sale under the state mortgage, and from the unfounded claims he has subsequently set up, as to the Lewis mortgages, and otherwise. I think the vice chancellor was therefore right in charging him with the costs. But as he has succeeded upon this appeal in obtaining a material modification of the decree, I shall not give to either party costs, as against the other, upon the appeal.