KING and others *v.* McVICKAR, J. L. LAWRENCE, administrator, &c., and others.

J. L. LAWRENCE, administrator, &c., *v.* KING and others.

A mortgagor, and one to whom he had subsequently conveyed part of the lots mortgaged, subject to a portion of the debt, applied to a banker to advance money to satisfy the mortgagee.. The banker made the advance, on such grantee of part of the lots, agreeing to take an assignment of the mortgage for his benefit and security, as against the lots remaining in the mortgagor; half the sum requisite to satisfy the mortgagee, being furnished at the time, ostensibly by the grantee. Payment was made to the mortgagee, who assigned the mortgage to the grantee; and he soon after cancelled it of record, without the assent or knowledge of the banker.

*Held,* that the transfer for the benefit of the latter was valid, and the subsequent discharge of the same was void, and that he could re-instate the mortgage, and foreclose it against the lots still owned by the mortgagor, and against a second mortgagee of the same, whose lien was prior to the cancelment, but subsequent to the first mentioned mortgage.

After the first mortgage was cancelled, the banker to secure his advance, obtained from the grantee who cancelled it, a mortgage on other lands of some value; and subsequently the grantee gave to him another mortgage on those lands, to secure debts due to the banker as trustee. After this he conveyed the lands to the banker in fee, in trust for several persons. It appeared that as between the original mortgagor and such grantee, the latter was liable in respect of his lots formerly subject to the mortgage, to pay a part of such advance. *Held,* that on the banker's re-instating and enforcing the original mortgage, the second mortgagee stood in the place of a surety for such grantee to the extent of his liability to make good the advance, and was entitled to that extent, to the benefit of the subsequent security taken for the advance, by the banker, from the grantee.

*Held* also, that such equity of the second mortgagee, could not be enforced against the beneficiaries under the conveyance to the banker in trust, until they were made parties to the suit.

A cross bill in behalf of the second mortgagee to enforce such an equity, will be sustained.

Where there is to be a long controversy as to the extent of the equity of a second mortgagee, who is entitled to a subsidiary security obtained by the first mortgagee; the civil law rule of subrogation will be adopted, and a decree for the satisfaction of the first mortgage made at once, instead of requiring the holder thereof in the first instance to resort to his ancillary security.

The decree will at the same time, provide for the second mortgagee's right of subrogation to such security.

Parties acquiring liens or interests subsequent to the recording of a mortgage, must notify the same to the mortgagee, if they wish to influence or control his action in respect of the lands mortgaged.

The recording of a mortgage is not notice of its existence to a prior mortgagee.

A party setting up a prior legal right in an answer, is not bound to deny notice of a subsequent lien or interest, unless such notice be distinctly alleged against him. The rule is different, where one is resisting a prior title, on the ground that he purchased in good faith, without notice.

An assignment of a mortgage to one who has taken a conveyance of a part of the mortgaged premises from the mortgagor, will not operate as a merger in respect of the premises still owned by the latter.

Oct. 21, 22, 23, 1845; February 4, 1846.

THE first cause was a bill filed October 7th, 1842, by James G. King, Edward Prime, Samuel Ward and Denning Duer, transacting business under the name and firm of Prime, Ward & King; against Benjamin Vickar and Isaphene, his wife, John L. Lawrence, administrator, &c., of Isaac Lawrence, deceased, and William Beach Lawrence. All of the defendants suffered the bill to be taken as confessed, except J. L. Lawrence, administrator, &c., who put in an answer, setting up against the claim of the complainants, various rights and equities founded upon the right of. McVickar to compel W. B. Lawrence to relieve the lands in question from such claim, and insisting that those lands were not liable.

In May, 1843, J. L. Lawrence, administrator, &c., commenced the second suit above entitled, by filing a cross bill against the complainants in the first suit, together with McVickar and wife, and W. B. Lawrence and Esther R., his wife. Answers to this bill were put in by W. B. Lawrence, and by Prime, Ward and King. Replications were filed to the answers in both suits, and testimony was taken. W. B. Lawrence was examined as a wit-

ness for the complainants in the first suit, and B. McVickar for the complainant in the cross suit.

The causes were heard together on the pleadings and proofs.

It is not deemed necessary to state the pleadings at large ; and instead of inserting the testimony, the report of the case contains the material facts as ascertained by the court, which were as follows :

On the 16th of October, 1838, McVickar was seised in fee of a parcel of land in the city of New York, extending from Eighth to Ninth streets, and from the Sixth Avenue, eastwardly 227 feet, six inches, except a lot, 75 feet by 23½ feet, fronting on Sixth Avenue, at the corner of Ninth street. The property was known as lots numbers 5, 7, 9, 11, 13 and 15, Eighth street, numbers 321, 323, 325, 327, 329 and 331, on Ninth street, and 100, 102, 104, 106, 108, 110, 112 and 114, Sixth Avenue. In all this property, W. B. Lawrence claimed, and had an interest as equitable owner, in common with McVickar. Previously and on the first day of July, 1836, McVickar had executed his bond for $50,000, and he and his wife had executed their mortgage to secure the bond, to W. B. Lawrence, on the twelve lots on Eighth and Ninth streets above described. On the 12th day of July, 1836, W. B. Lawrence assigned the bond and mortgage to The American Life Insurance and Trust Company. The mortgage and assignment were recorded July 15, 1836.

On the 23d of May, 1837, McVickar and wife executed a mortgage to the same American Trust Company, on the four lots on Sixth Avenue next above Eighth street, and known as numbers 100, 102, 104 and 106. This mortgage was recorded in July, 1837, and was given as further security for the debt secured by the former mortgage.

On the 16th of October, 1838, McVickar executed his bond, and he and his wife executed their mortgage to the same Trust Company, for the payment of $55,000, on all the lots above mentioned. The mortgage was recorded October 18th, 1838. The sum advanced on this bond and mortgage, was only $45,089 90 ; and on the 7th of March, 1839, the Trust Company by reason of the deficiency, released from all their mortgages, the lot designated as *seven*, Eighth street. On the first of September, 1839,

the Trust Company released and discharged number 9, Eighth street, in like manner.

On the 12th of February, 1840, McVickar and wife executed a mortgage to Isaac Lawrence, upon all the before mentioned premises and other lands, to secure him for all advances and liabilities by him made to or incurred for McVickar, and to indemnify him against the same. The mortgage was recorded three days after its date. At the period of these suits, the premises mortgaged were insufficient to satisfy those liabilities and advances, and McVickar was unable to pay any deficiency.

On the same 12th of February, W. B. Lawrence and wife executed a mortgage for the like purpose to Isaac Lawrence, which was recorded the same day, and conveyed with other real estate, all his right, title and interest, in the lots herein before described. In 1842, the premises subject to this mortgage, were entirely inadequate to pay the amount claimed to be due upon it; and the mortgagor was not able to pay any deficiency.

On the 1st day of June, 1840, the American Trust Company discharged from their mortgages, the four lots, 114 Sixth Avenue, and 327, 329 and 331, Ninth street, for the consideration of $28,250, and received for that sum in the aggregate, four mortgages of McVickar and wife, one on each of the lots released. These mortgages were recorded in September, 1840, and in the same month, were assigned by the American Trust Company to The New York Insurance Company, to secure $20,000. Isaac Lawrence at the same time executed an instrument, giving to these four mortgages priority over his mortgage executed by McVickar.

At this time there remained due to American Trust Company, including their interest in the four mortgages held by The New York Insurance Company, about $68,089 90.

On the 8th day of March, 1841, Isaac Lawrence released to McVickar lot 331 Ninth street, from the lien of his mortgage. The release was recorded the same month.

On the 15th day of May, 1841, McVickar and W. B. Lawrence made a division between themselves, of the premises still subject to the three American Trust Company mortgages first mentioned, and apportioned upon each lot, a share of the amount due on

those mortgages. The division embraced other lots, on which there were similar apportionments of liens. In this apportionment, there fell to W. B. Lawrence, the lots 325 Ninth street, 100, 102, 104 and 106, Sixth Avenue, and 5, 13 and 15, Eighth street; subject to the payment of $35,750 in the aggregate, to the American Trust Company on the original mortgages. And McVickar received lots 321 and 323 Ninth street, 11 Eighth street, and 108, 110 and 112 Sixth Avenue, subject in like manner to the payment of $21,750, on the old mortgages.

Besides these, 327 and 329 Ninth street, were allotted to W. B. Lawrence, subject to $8000, on each of the mortgages assigned to the New York Insurance Company ; and 331 Ninth street and 114 Sixth Avenue, were allotted to McVickar, subject, the former to $8000, and the latter to $4250, of the same mortgages.

Isaac Lawrence's administrator, claimed that on this division, W. B. Lawrence was bound to pay to the American Trust Company in the whole, $40,422 57, and McVickar $25,327 43 ; besides the proportion each was to pay to the New York Insurance Company. And each was to bear one half of the sum due to the Trust Company, not included in the apportionment.

On the 15th of May, 1841, McVickar and wife, conveyed to W. B. Lawrence, in fee, the lands which in the foregoing division were allotted to him. The deed expressed a consideration of $74,250, and was recorded June 19, 1841. At the date of this deed, Isaac Lawrence released the lots thereby conveyed, from the mortgage executed to him by McVickar, and the release was recorded at the same time with the deed. Until this time, W. B. Lawrence had no legal title to the lots conveyed to him by McVickar. The division and apportionment between those parties, and the agreements respecting the same, were not recorded. The deed and the release of Isaac Lawrence, were the only instruments which appeared on the record.

Prime, Ward & King, were ignorant of the matter, except that they were informed that McVickar had conveyed to W. B. Lawrence, certain parts of the property mortgaged to the American Trust Company, and that a part of the indebtedness to the company was apportioned among the lands, allotted to the parties respectively, and the residue was to be borne by them equally.

Previous to June 1841, an agreement was made between W. B. Lawrence and McVickar, and the American Trust Company, by which the latter agreed to receive their own certificates of deposit then outstanding, in payment of the indebtedness to them on McVickar's mortgages.    The sum then due to them was about $76,784 66, and their certificates could be bought in the city of London, for about sixty cents on the dollar.

W. B. Lawrence and McVickar thereupon applied to Prime Ward & King, for their aid in obtaining such certificates, through their correspondents in London, Messrs. Baring, Brothers and Company ; who upon their intervention, purchased sterling certificates of the American Trust Company, amounting to £20,000.

These certificates were received by Prime, Ward & King from Baring, Brothers & Co., on the 10th day of June, 1841, with instructions to deliver the same to W. B. Lawrence, on receiving in cash, the balance due for their cost, which calculated to August 31st, when the remittance therefor would be realized, amounted to £10,274 10, or in dollars at the then rate of exchange, $50,048 93.    The residue of the cost of the certificates £2000, had been remitted to them by W. B. Lawrence.    Of the sums paid for this remittance, he and McVickar had each furnished a portion.    They differed widely as to the sums which each had advanced for the purpose, McVickar claiming he had paid all that his lots were chargeable with in the apportionment, and W. B. Lawrence insisting that he had advanced nearly the whole sum himself.    The testimony left this matter in great obscurity.

On the 19th day of June, 1841, Prime, Ward & King delivered the Trust Company certificates to W. B. Lawrence, and received from him $25,048 91, which sum he then alleged to them, he had obtained in whole or in part on the security of a portion of the lands mortgaged, which had been conveyed to him by McVickar in May preceding.    He requested a few days delay for the payment of the balance of $25,000 for the certificates, avowing the object to be, to enable McVickar to obtain it by loans on the property incumbered in favor of the American Trust Company ; the loans were stated to be in progress, and from them Prime, Ward & King were to be paid.    At the time of the request for delay, it was agreed between them and W. B. Lawrence (as-

suming to act also for McVickar, and authorized by McVickar to do whatever was needful to effect the arrangement with the American Trust Company ;) that on delivering the certificates to that company, instead of satisfying their mortgages executed by McVickar, which were a lien on his lots as set off in the division ; the bonds and mortgages should be assigned to W. B. Lawrence, and held by him on account of and for the benefit of Prime, Ward & King.

W. B. Lawrence delivered the requisite certificates of deposit, to the American Trust Company, and they assigned to him the three bonds and mortgages of McVickar heretofore described.

The assignment was dated and recorded June 18th, 1841, and expressed the consideration of $68,534 66, the principal and interest then due to the Trust Company on the three mortgages.

Prime, Ward & King, as a further security for the $25,000, balance due for the certificates, took a joint and several note for that sum, dated June 19, 1841, signed by W. B. Lawrence and by Isaac Lawrence, payable with interest on the 15th of August following. The latter was the father of W. B. L. and the father-in-law of McVickar, and was then reputed and believed to be a man of great wealth, and as being a sufficient surety for that amount. Previously, and on the 12th of June, Isaac L. had written a letter to Prime, Ward & King, agreeing to guaranty the payment by W. B. L. of the £20,000, of certificates, if they would deliver them to W. B. Lawrence.

McVickar and W. B. Lawrence, succeeded in negotiating a loan of G. Barclay, which was to pay off Prime, Ward & King, and which loan Isaac Lawrence was to guaranty, and was to give it priority over his mortgage against McVickar; and W. B. Lawrence, being about to leave for a long absence, to enable McVickar to complete the loan in his absence, without the knowledge, assent or authority of Prime, Ward & King, on the 24th day of June, 1841, executed satisfaction pieces of the three Trust Company mortgages which had been assigned to him, and the same were recorded the same day, and the mortgages thereby cancelled of record. Prime, Ward & King, claimed that this act and the cancelment, was null and void as against them.

The Barclay loan was by agreement changed to other lands

of McVickar and W. B. Lawrence, and securities thereon for $20,000, with the bonds of those parties, were prepared and signed; but before Isaac Lawrence's signatures were obtained to the guaranty and priority agreement, he died suddenly, intestate, on the 12th day of July, 1841. This wholly defeated the loan from Mr. Barclay. No payment of any part of the $25,000 and interest, was ever made to Prime, Ward & King, and they claimed in their bill, that the same was due to them on the mortgages to the American Trust Company so assigned for their benefit, and cancelled without their authority. They thereupon prayed a foreclosure and sale of the lands which were subject to those mortgages when they were so assigned, and payment of the $25,000 and interest, out of the proceeds of the sale. They alleged that the following lots of McVickar, were still subject to the mortgages, and not conveyed or incumbered except to Isaac Lawrence, viz. lots 11 Eighth street, 321 and 323 Ninth street, and 108, 110, and 112, Sixth Avenue.

John L. Lawrence was appointed administrator of Isaac Lawrence, on the 19th day of November, 1841, and on an investigation of his affairs, it was found that his estate was insolvent to a large amount.

McVickar claimed that he had advanced to W. B. Lawrence, about $14,800, of the $25,048 93, which he paid to Prime, Ward and King, on receiving the certificates. On the other hand, W. B. Lawrence insisted, that he had furnished the whole of this sum from his own funds and means, by a mortgage to the Equitable Insurance Company on five of the lots which McVickar had conveyed to him in May preceding.

At the time of the transfer of the three original mortgages, the Trust Company also transferred to W. B. Lawrence, their surplus interest in the four mortgages of McVickar assigned to the New York Insurance Company. It was also claimed by Isaac Lawrence's administrator, that the Trust Company allowed to W. B. Lawrence $83,761 92 for the certificates he delivered to them, and that the sum beyond paying the debt on the McVickar mortgages, was applied to the settlement of a note of W. B. Lawrence's.

It appeared that on the same 18th day of June, 1841, W. B.

Lawrence and his wife executed a mortgage to the New York Equitable Insurance Company, for $25,000, (with his bond for the same sum,) on the lots 5 Eighth street, and 100, 102, 104 and 106 Sixth Avenue. This loan enabled him to pay to Prime, Ward & King, the $25,048 93, paid in cash on the delivery of the certificates of deposit.

W. B. Lawrence and wife, on the 1st day of November, 1841, executed a mortgage to James G. King, on the undivided half of six lots, on Union Square, and on four lots near the former, to secure the payment of the note of $25,000, signed by W. B. and Isaac Lawrence in June preceding. This mortgage was recorded January 21, 1842. The premises had been discharged by Isaac Lawrence in his life time, from the lien of the mortgage executed to him by W. B. L. Of the ten parcels thus mortgaged to Mr. King, six were foreclosed and sold under prior mortgages, leaving but little surplus ; and the residue were incumbered, two of them to an amount exceeding their value. The other two were undivided interests.

On the first day of August, 1842, W. B. Lawrence and wife executed a mortgage to James G. King, on the same lands included in the mortgage of November 1st, 1841 ; to secure to him any liability of W. B. L. to him individually, or as a trustee for others. This mortgage was recorded November 9, 1842.

It appeared that on the 26th of April, 1843, J. G. King became entitled by a decree in chancery, to recover a deficiency of $10,051 26, on the foreclosure of a mortgage executed by W. B. Lawrence in 1837, to Mr. King, as trustee under the will of Rufus King. Isaac Lawrence was liable as guarantor of the debt, and his administrator was a party to the foreclosure. An execution for this deficiency, was returned wholly unsatisfied in 1843.

Of the lots which W. B. Lawrence obtained by the deed of McVickar in May, 1841, five were mortgaged to the Equitable Insurance Company, as before stated. The lots 13 and 15 Eighth street, were mortgaged for $6000 by W. B. Lawrence and wife to Morris Robinson, on the 16th day of November, 1841 ; and he having assigned the mortgage to The New York Life Insurance and Trust Company, December 29th, 1841, W. B. L. and wife on the same day executed to the latter, a further mortgage thereon

for $3000, and to answer all other liabilities of W. B. L.'s. The lots 327 and 329 Ninth street, which were not subject to the American Trust Company's three mortgages in May, 1841, were subject to mortgages for $12,000, executed to that company and assigned to the New York Insurance Company.

On the 29th of March, 1842, W. B. Lawrence conveyed to James G. King, in trust, the two last mentioned lots, and the five lots mortgaged to the Equitable Insurance Company. The trusts were, for the benefit of the wife of W. B. L. during her life as to the income, and upon her death to convey the premises in fee to such of her issue as she should appoint, and in default of appointment, then to her issue ; with sundry powers of disposal and investment in the trustee. This deed was recorded April 21, 1842.

The lot 325 Ninth street, was mortgaged by W. B. L., on the 1st day of November, 1841, to secure $3885 50, to the representatives of W. and R. Bruce.

The lots embraced in all the conveyances and mortgages of W. B. Lawrence heretofore stated, and which had been conveyed to him by McVickar, had been released by Isaac Lawrence from the lien of his mortgage against McVickar.

In his cross bill, Isaac Lawrence's administrator prayed to have the securities held by James G. King, and by Prime, Ward & King, marshalled ; and that they should resort for their $25,000 and interest, first to the mortgage to Mr. King of the 1st November, 1841, on the Union Square lots, and to their other securities, aside from the American Trust Company mortgages ; and to be restricted under the latter, if capable of being enforced, to the balance of the sum which McVickar assumed in the apportionment, as between him and W. B. Lawrence. The cross bill was founded on the alleged rights and equities of McVickar against W. B. Lawrence, at and prior to the cancelment of the American Trust Company mortgages, and the lien of Isaac Lawrence's mortgage against McVickar upon the lots which Prime, . Ward & King sought to foreclose.

The answer of W. B. Lawrence to the cross bill, insisted that he had paid more than his share of the amount, which in respect of his lots, he was bound to pay of the American Trust Com-

pany debt. He objected that the cross bill was improperly filed, and insisted on its being dismissed with costs. The course which the causes took at the hearing, renders it unnecessary to state more of the case made by Mr. Lawrence.

*James G. King, Jr.,* and *Daniel Lord,* for Prime, Ward & King.

*G. M. Ogden* and *David B. Ogden,* for J. L. Lawrence, administrator, &c.

*W. B. Lawrence,* in person.

Mr. *King,* for the complainants in the original suit, made the following points:

I. The agreement made by Prime, Ward & King, with William Beach Lawrence, that the latter, should take from The American Life Insurance and Trust Company, an assignment of the mortgages held by the company on the property of Benjamin McVickar, and hold them as security for the re-payment to Prime, Ward & King of twenty-five thousand dollars, advanced by them to enable McVickar and Lawrence to carry out the negotiation by which the company were to receive their own certificates of deposit in exchange for the mortgages held by them on the property on Sixth Avenue, Eighth and Ninth streets; was a valid agreement, and can be enforced in a court of equity. ( *White* v. *Knapp,* 8 Paige, 173; *Green* v. *Hart,* 1 Johns. R. 580, 583, 590; *Runyan* v. *Mersereau,* 11 Johns. 534; *Jackson* v. *Blodgett,* 5 Cowen, 202; *Deverich* v. *Baines,* Prec. in Chan. case 3; *Baily* v. *Boulcott,* 4 Russell, 345; *Nab* v. *Nab,* 10 Mod. R. 404; *Benbow* v. *Townsend,* 1 M. & K. 506; 2 Story's Eq. Jur. 280, § 972; 2 Fonbl. Eq., ch. 2, § 4, note *a ; Moses* v. *Murgatroyd,* 1 J. C. R. 119; 3 Rev. St. 658, § 2—2d ed., Reviser's Notes.

II. William Beach Lawrence was the representative of both McVickar and Isaac Lawrence in all these transactions. They were aware of what he had done, and did not at the time, nor afterwards, notify Prime, Ward & King of their dissent from the

arrangement he had made, and are consequently bound by his acts.

III. The cancelment of the mortgages by William B. Lawrence, without consideration, and without the knowledge of Prime, Ward & King, was unwarranted, and in fraud of their rights, and did not divest the latter of their previously acquired rights, nor give McVickar and Isaac Lawrence any new or better rights. And Prime, Ward & King are entitled to a decree for foreclosure and sale of the premises, as if such cancelment had not been made. (2 Story's Eq. Jur. 629, § 1258; 1 ibid. 120, § 109.)

IV. The rights of Prime, Ward & King to the decree sought for, are irrespective of any state of accounts between McVickar and W. B. Lawrence. Even if McVickar had paid to W. B. Lawrence all which as between them he was bound to pay of the indebtedness to The American Life Insurance and Trust Company, and was in no ways indebted to William B. Lawrence on other accounts; the fault of his representative, if fault there were, must fall on him, and not on innocent parties dealing with his representative; and if McVickar cannot claim the benefit of such alleged payments, Isaac Lawrence, whose claim would be a derivative one from McVickar, can claim no more than the latter.

V. The defendant John L. Lawrence, shows no grounds for marshalling the assets, and compelling Prime, Ward & King to resort first to the mortgage on the Union Square property. (*Dorr* v. *Shaw*, 4 John. Ch. R. 17; *Ex parte Kendall*, 17 Vesey, 520; *Ellison* v. *Booth*, 19 Johns. 493; 1 Story's Eq. Jur. 651, § 634.)

VI. The complainants are entitled to a decree of foreclosure and sale, as prayed for by them, and to payment out of the proceeds, of the $25,000 due them, and to a decree that the cross bill be, as against them, dismissed with costs.

The Messrs. *Ogden*, for J. L. Lawrence, administrator, &c., argued upon the following points:

1. The cross bill was properly filed. We seek to compel the complainants in the first suit, to satisfy their debt out of other property than that mortgaged to our intestate.

2. The great question is, by whom, and out of whose funds, the $25,000 ought to be paid. We claim that the complainants are only general creditors of Isaac Lawrence on the guaranty, having no right to set up the American Trust Company mortgages at all. And if they have such right, that then they can obtain only half of their debt from McVickar, the debtor of the intestate.

3. Those mortgages were regularly cancelled of record, before the death of Isaac Lawrence, and their discharge remained unquestioned from June 19, 1841, to December 15, 1842, when the complainants had ascertained that their other securities were insufficient.

4. Though the legal title was in McVickar when the mortgages were g'ven, W. B. Lawrence had an interest in the property, and they were given for the benefit of both parties, who were joint mortgagors in equity.

5. Isaac Lawrence's mortgages were executed in 1840, the complainants knew of his mortgages, when they derived their rights. His mortgage against W. B. Lawrence became operative, when McVickar conveyed the lots to him. (Perkins, § 533; 4 Kent's Com. 98.)

6. The complainants had notice of these mortgages by the record in the office of the register of deeds.

7. They have voluntarily abandoned their claim against W. B. Lawrence's lots; and they have no right to be paid the whole out of McVickar's. The mortgages if cancelled in part, are cancelled in the whole. It is a joint debt—an entirety.

8. The mortgages were only to be held by W. B. Lawrence till Isaac Lawrence executed his guaranty. This is shown by the dates. The latter was executed June 19th. All the other transactions were on the 18th of June.

9. The complainants knew of W. B. Lawrence's interest in the property when it was mortgaged, and of the conveyance to him by McVickar subject to a part of the mortgages. They were bound to inquire as to the extent of that charge, and are therefore chargeable with notice of the division of the lots and the apportionment on each.

10. By that apportionment, W. B. Lawrence was to pay in re-

spect of his lots, $35,750, and McVickar was to pay $21,750, of the three mortgages to The American Life Insurance and Trust Company. The overplus was to be borne equally. In fact, McVickar had paid over $24,000, or more than his share, when the mortgages were assigned by the company, and W. B. L. had paid only about $11,000. He was thus deficient, the very amount advanced by the complainants.

11. The complainants are bound by the division and apportionment, and by this result; and they have no equity to compel McVickar's lots, to pay the sum they thus advanced for W. B. Lawrence.

12. Isaac Lawrence's administrator, standing as a surety, has a right to require the complainants to exhaust the security afforded by W. B. Lawrence's mortgages to James G. King, before resorting to the lots of McVickar which are subject to the intestate's mortgage. ·

THE ASSISTANT VICE-CHANCELLOR.—At the time the transaction in controversy was brought to a close with the American Life Insurance and Trust Company in June 1841, their mortgages executed by Dr. McVickar, were indisputably valid liens upon fourteen lots of ground, eight of which had been conveyed by McVickar to W. B. Lawrence on the 15th of May preceding, and six were still owned by McVickar himself.

So far as the Trust Company is shown to have had any notice, the whole sum requisite to discharge their mortgages was a charge upon all the lands mortgaged, and that company might have released any of the lots, without being subjected to loss in consequence of any equities of Isaac Lawrence, or any existing between Dr. McVickar and W. B. Lawrence.

Prime, Ward & King became interested in the subject matter, on their advancing the $25,000, on the purchase of the Trust Company's certificates. So far as they were chargeable with notice, on succeeding to those mortgages in the manner which they allege in their bill, the mortgages were the first lien on those fourteen lots, and valid for the $50,048 93, which was payable for the Trust Company certificates. They received $25,048 93, of W. B. Lawrence, and advanced the residue, as they insist, on

the security of the mortgages upon the lots still owned by Mc-Vickar.

The first issue made by the original suit, is on the fact of their having thus made the advance.

On this point, the testimony is direct and positive, that they delivered the certificates to W. B. Lawrence, upon his agreeing to take an assignment of the mortgages from the Trust Company, and to hold them as a security, so far as it respected Dr. McVickar's lots, for the payment to them of the $25,000.

The circumstances relied on by the counsel for Isaac Lawrence's administrator, as casting doubt upon this agreement, are nearly all explained by the fact that the affair occupied two days in its adjustment, and some of the papers were dated on the 18th of June and some on the 19th, although in legal consideration to be deemed as cotemporary writings.

The next question presented in the original suit, is as to the right of the complainants to make such an agreement, or to set up the mortgages when assigned, against the lands of McVickar only.

As to this, there is no technical difficulty in the way. W. B. Lawrence was not the mortgagor in either of the mortgages. And as to the lots owned by McVickar, an assignment to W. B. Lawrence would not operate as a merger. As to his own lots, it might so operate, *pro tanto*, unless there was an intention to the contrary; but that could not affect the lots still vested in the mortgagor, where the intention was express, to keep the mortgages outstanding.

The objections to the complainants' right are, that the debt was in equity a joint debt of McVickar and W. B. Lawrence; that the lands mortgaged had been divided, and the greater part of the debt apportioned upon those conveyed to W. B. Lawrence, who was bound to pay such apportionment; and that McVickar had furnished to W. B. Lawrence, all, or nearly the whole of the amount which in respect of the lots retained by him, he was liable to pay towards the purchase of the certificates which were to discharge the mortgage. Also that Isaac Lawrence had a junior mortgage on McVickar's lands, and his rights are impaired by the proceeding which the complainants seek to enforce. The

objections assume that the complainants were chargeable with direct or constructive notice of all these matters.

1. As to the character of the mortgage debt to the Trust Company. It was at law, the sole debt of McVickar. There was no joint personal liability of W. B. Lawrence, and in one of the mortgages he was the mortgagee. So far as notice to the Trust Company is concerned, there is no proof that they ever knew of W. B. Lawrence's interest in the property, either before or after the conveyance to him on the 15th of May, 1841. The complainants are therefore not subjected to any notice through their assignors.

As to the complainants themselves, I think it sufficiently appears that they were aware of the fact that W. B. Lawrence had claimed an interest in the mortgaged premises before the division in May, 1841, but this interest did not make him a joint debtor, even in equity. His equitable right or interest in the lands, (if he really had any right beyond an honorary one,) was subject to the mortgage debt, but he was not personably liable.

In May 1841, the division and apportionment was made, embracing lots not subject to these mortgages, and other mortgages on such lots. Mr. King knew that there had been a division of the lands between McVickar and W. B. Lawrence, but he knew nothing of the particulars, or of the apportionment. It is evident that he had been informed of the execution by McVickar of a conveyance of some of these lots to W. B. Lawrence, but it does not appear that he had seen the deed, or heard of its contents. The deed was not recorded till the 19th of June; and if it had been recorded a month before, the record would not have been notice to the prior mortgagee.

This presents the whole subject of notice to the complainants, as it is disclosed by the proofs. Now what were the legal and equitable presumptions, which Mr. King was authorized or required to entertain, from all that he had thus learned? The mortgages which he was about to obtain, were executed on fourteen lots. The title at that time was in one man, the actual interest in two. These men had divided the lots between them, and the one having the legal title, had conveyed to the other the lots assigned to the latter. Mr. King had never heard what shares

each had in the lots originally; nor what proportion of them had been assigned to the one or the other in the division; nor how they had arranged the liens in respect of such lots, if they had arranged them at all. It appears to me that the just and only inference which he could deduce from the facts known to him was, that the parties had an equal interest originally, and that on their division they had made an equal distribution of the lots and of the mortgage debt. I am not sure that he was bound to draw any inference from such information, which was to affect his dealing with the securities.

But it may be said he was put upon inquiry by these facts; it was incumbent upon him to ascertain McVickar's rights. As representing the first lien, (when he became assignee,) I think he was not called upon to pursue these inquiries. He could stand upon the recorded mortgages, unaffected by events subsequent to their being recorded, unless such events were distinctly presented to his consideration. It was the duty of parties who had acquired subsequent rights in the property, or whose existing rights had become changed; to notify the same to the mortgagees, if they were liable to be affected by the action of the latter.

In this case, the complainants succeeded to all the rights of the Trust Company, and are not liable by reason of constructive notice of the apportionment made on the division of the lands. .

There is no evidence that either the Trust Company or the complainants had any information of the alleged payments by Dr. McVickar to W. B. Lawrence, towards the former's portion of the cost of the Trust Company certificates.

As to the junior mortgage of Isaac Lawrence, I find no proof that the complainants or their assignors knew of its existence. It was argued, that the complainants ought to have denied notice in their answer to the cross bill. I think not, because the cross bill did not allege notice. It is not like the case of a defendant resisting a prior or better title, on the ground of a bona fide purchase without notice. Here the parties answering the cross bill, were meeting an equity which was set up against their elder and prior legal right.

Then it is said that the record of Isaac Lawrence's mortgage

was notice to the complainants. This would be true if they were purchasers of the property mortgaged to Isaac Lawrence. But in fact they are purchasers of a title prior to his, and they were not required to search the records posterior to the date of that title. The recording of a deed or mortgage, is not notice of its existence to a prior mortgagee. (*Stuyvesant* v. *Hone*, 1 Sand. Ch. R. 419.)

The result is, that when the complainants stipulated for the assignment in question, they had a right to assume that the $50,048 93, payable to the Trust Company, was a charge devolving equally upon McVickar and W. B. Lawrence, and that the lots of each were to bear an equal proportion of the burthen. On delivering the certificates, they received from W. B. Lawrence, a trifle more than half of that sum, and probably knew that he raised it upon a mortgage of five of his lots which were under the Trust Company mortgages. They were therefore warranted in assuming that Dr. McVickar and his lots, were to pay the remaining $25,000; and it was both competent and proper for them to take an assignment of the mortgages, and hold it as security against his lots for the repayment of that sum.

The subsequent cancellation of the mortgages, did not impair the complainants' rights as against the parties now before the court. Dr. McVickar participated in the act, and neither Isaac Lawrence or his administrator, have derived any new rights, or parted with any securities in consequence of the cancellation. It was wholly unauthorized as to the complainants, a violation of their rights, and as to them is void. On the case made by the original bill, the complainants are, in my judgment, entitled to the relief which is therein prayed.

The equity which the administrator of Isaac Lawrence sets up in the cross bill, aside from his defence to the original suit, may be thus stated. Admitting that Prime, Ward & King, were entitled to advance their $25,000, upon an assignment of the Trust Company mortgages, and to hold them against Dr. McVickar's lands; yet in point of fact, as between him and W. B. Lawrence, Dr. McVickar was not obligated to pay that $25,000. Mr. W. B. Lawrence ought to pay a considerable part of it, if not the whole. Isaac Lawrence, as a junior mortgagee of Mc-

Vickar's lots, had an equity to compel W. B. Lawrence to dis-charge his portion of the $25,000, in order to relieve those lots of McVickar's, and thus to benefit Isaac Lawrence's security. That W. B. Lawrence could not by his own act, in discharging the Trust Company mortgages, so far as they were a lien on his land, without paying his just proportion of the $25,000, defeat this equity of Isaac Lawrence. That Prime, Ward & King, having obtained from W. B. Lawrence, a mortgage for the further security of this $25,000, the administrator of Isaac Lawrence, is entitled to the benefit of that mortgage, so far as to exonerate McVickar's lots from W. B. Lawrence's just proportion of the $25,000. And it is alleged, that the lands thus mortgaged to Prime, Ward & King, are still liable to be subjected to this equi-ty, unaffected by any subsequent *bona fide* conveyance or in-cumbrance.

In answer to this claim made by the cross bill, it is insisted, first, that the case thus stated, furnishes no ground for marshal-ling the assets, and compelling Prime, Ward & King, to resort in the first instance to the mortgage given by W. B. Lawrence ; and *Ex parte Kendall*, (17 Ves. 520,) and *Dorr* v. *Shaw*, (4 J. C. R. 17,) are relied upon as authorities.

In both of those cases, the attempt was by a junior lien credi-tor of B., to compel a senior lien creditor of A. and B., to exhaust A.'s property first, without showing any equitable right in B. to have the latter debt charged on A. alone. Lord Eldon said, and Chancellor Kent adopted his language, that there must be a right in the creditors of B., founded on some equity of B., giving him *as a surety* or otherwise, a right to compel A. 'to pay the joint debt ; that it must appear to be just and equitable that *A. ought to pay in the first instance*, or else there is no equity to compel the creditors to go against A., who have a resort to both funds.

In my view, these authorities sustain the principle of the cross bill. On the case stated, when McVickar conveyed the lots to W. B. Lawrence in May, 1841, by force of the apportionment of the liens, the lots of the latter as between himself and McVickar, became liable to discharge $45,939 90, of these mortgages to the Trust Company. As to this sum, he was the principal debtor in equity, and McVickar was his surety in respect of the

lots of McVickar still liable to the mortgages, as well as by force of his personal liability on the bonds accompanying the mortgages. Therefore, when the mortgages were discharged, McVickar had as against the lots of W. B. Lawrence, the precise equity which Lord Eldon and Chancellor Kent described, as entitling one of the joint debtors to require the other to discharge the obligation. This was an equity which was bound by the lien of Isaac Lawrence's mortgage, and his representative may avail himself of it. (*Kellogg* v. *Wood*, 4 Paige, 578.) McVickar's assent to the discharge of the mortgages cannot affect this lien, both because he had no right to impair it, and because his assent appears to have been given under the expectation that his lots, as well as those of W. B. Lawrence, were to be actually discharged.

According to the cross bill, W. B. Lawrence has not satisfied the amount for which McVickar's lots were incumbered in his behalf; hence the equity which I have described, continued to the extent of his deficiency, as between him and McVickar, and the junior mortgagee of McVickar, is thus placed in the relation of surety for W. B. Lawrence in respect of the junior mortgage on these lots of McVickar's.

In reply to the claim of the administrator of Isaac Lawrence to have the $25,000 mortgage to Mr. King marshalled, it is shown, that in August, 1842, W. B. Lawrence executed a further mortgage to Mr. King, on the lands conveyed by the mortgage of November 1, 1841, to secure any indebtedness of W. B. Lawrence to Mr. King, individually and as trustee, which was not otherwise secured; and it is then shown, that Mr. King as trustee, has such a claim against W. B. Lawrence, to more than $10,000, for which Isaac Lawrence was liable as guarantor.

I think this second mortgage does not impair the right of the administrator to relieve McVickar's lands through the first mortgage to Mr. King. Mr. King is not a mortgagee who has advanced money upon the faith of the second mortgage. He obtained it for a precedent debt, and has not parted with any security or property, in consequence of its execution. His equity is therefore no better than that of McVickar and his mortgagee, and theirs being prior in time, must prevail. The guaranty of

Isaac Lawrence does not affect the question, as the case is presented here. Before giving it effect, (if such a circuitous equity could be permitted,) it would be necessary to understand the state of the accounts and other securities existing between Isaac and W. B. Lawrence, between Isaac Lawrence and McVickar, and possibly those between the Lawrence's and Mr. King himself.

No question of parties is raised in respect of these mortgages, and as the last mortgage was in Mr. K.'s name, without any addition as trustee, there is no occasion for further parties, or of designating him as trustee in order to proceed with the cause.

The cross bill states a conveyance by W. B. Lawrence to Mr. King, as trustee for Mrs. W. B. Lawrence, of various lots which were subject to the Trust Company mortgages, and seeks to have the benefit of those mortgages against such lots also, by way of substitution, to make good W. B. Lawrence's deficiency in paying the same. As to two of those lots, (327, and 329 Ninth street,) there is the further ground, that the mortgages thereon held by the New York Insurance Company, cover in addition to their debt, a portion of the Trust Company debt, which was discharged by the certificates in June, 1841, and as to such portion, McVickar and his mortgagee have a right to the benefit of those mortgages, in respect of W. B. Lawrence's deficiency. These questions affect the rights of the children *in esse*, of Mrs. W. B. Lawrence, as the persons presumptively entitled to the remainder of the trust estate, and they, as well as the trustee as such, should be parties to the suit, before the court can properly dispose of them.

It was objected to the cross suit, that it sought to introduce, and have a decree upon new subjects of litigation, wholly unconnected with the original suit; and *Galatian* v. *Erwin*, (Hopk. R. 48, & 8 Cow. 361,) was cited. In that case the decree sought in the cross suit, was based upon the entire overthrow of the original suit, besides relating to lands not affected by the original bill. The relief sought in this cross bill, proceeds upon the footing that the claim in the original suit is proper, but that the relief therein ought to be decreed against others of the defendants, and other property than that sought to be primarily charged. I have no doubt but that it is a proper case for a cross bill.

I have now gone over the points of law raised by the cross bill, and will next consider the only disputed fact which I deem material to the proper disposition of the cause at this time, which is whether W. B. Lawrence has paid his proportion of the Trust Company mortgages.

In this inquiry, I set out with the apportionment made between him and McVickar in May, 1841, and I must say unhesitatingly, that there is no mode of stating the transaction upon that basis, by which I can make out that he has paid the share of those mortgages, which he assumed upon his lots in the apportionment. Whether the Trust Company debt embraced in the mortgages assigned to the New York Insurance Company, be included or omitted; and whether the calculation be made on the full amount of the Trust Company debt, or upon the sum which was required to pay for the certificates with which it was discharged; the result is in this respect, the same.

In this conclusion I leave out of view, the sums which Dr. McVickar says he paid towards those certificates, and take all that Mr. Lawrence gives as paid by himself. I do this irrespective of the propriety of McVickar's claims; it being unnecessary at this time, to decide their validity.

The question arises between Mr. King and the administrator, and the answer of W. B. Lawrence is not to be weighed in disposing of it.

In my view therefore, the cross bill is sustained in its principle, and the administrator of Isaac Lawrence is entitled to a part of the relief for which he prays.

As to a portion of his case, further parties are requisite, and the cross bill must stand over, to enable him to bring them before the court. Inasmuch as the case may be varied by the issues which may arise between him and the new parties, I will not at this time enter into the details of the payments made by McVickar and W. B. Lawrence respectively, towards the purchase of the Trust Company certificates. I trust, when that question comes up for decision, it will be better elucidated by the testimony, than it seems to be by the papers before me.

To recur to the original suit. The complainants have a clear right to enforce the amount due to them against the lots of Dr.

McVickar.    Although by Mr King's vigilance, a subsidiary se-
curity has been obtained, to which the cross bill shows a quali-
fied right, on the complainants' debt being paid, it would be in
equitable and unjust, longer to delay their remedy against the
primary fund, in order to settle the controversy between these
other parties, in which they have no interest.  This considera-
tion is strengthened by the fact, that the further delay occurs in
consequence of the omission of parties in the cross bill.   I feel
warranted therefore, under the circumstances, in adopting the
civil law rule of subrogation, instead of requiring the complain-
ants in the first instance to resort to the ancillary securities for
their debt.

The complainants in the original suit, may have a decree re-
instating the Trust Company mortgages against the lots of Mc-
Vickar, and for a sale thereof to pay the amount remaining due
to them on the $25,000, and their costs of that suit.   The same
decree will declare that Isaac Lawrence's administrator is entitled
to the benefit of the mortgage to Mr. King, dated November 1,
1841, (after the payment of such amount to the complainants,)
to the extent of so much of the $25,000, and interest, as W. B.
Lawrence's lots ought to have paid, and which is collected out
of the lots of McVickar.   It will further direct that the cross bill
stand over, with leave to the complainant therein to add parties,
and reserving all the other questions and directions growing out
of the cross suit ; with liberty to apply &c., and for any party to
set it down as upon the equity reserved, on the complainants'
omission to proceed.   On amending the cross bill, the complain-
ant must pay the defendant's costs of the hearing.

As the suit is to stand over, it is not proper in this stage of it,
to make a final disposal of the case between the administrator
and W. B. Lawrence.

Decree accordingly.